## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| JASMINE MULLINS, KEVIN MOLE, LAURA GILSTRAP, REGINALD WELLS, SABRENA ALEXANDER, STEPHANIE RAMOS, and KAREN MCCLUNEY, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> PRISMA HEALTH, PRISMA HEALTH RETIREMENT ADMINISTRATIVE COMMITTEE, DEFINED CONTRIBUTION RETIREMENT PLANS ADMINISTRATIVE COMMITTEE OF PRISMA HEALTH AND AFFILIATE ORGANIZATIONS, and JOHN DOES 1-20, <br><br> Defendants. | CIVIL ACTION NO.: |

## CLASS ACTION COMPLAINT

Plaintiffs, Jasmine Mullins, Kevin Mole, Laura Gilstrap, Reginald Wells, Sabrena Alexander, Stephanie Ramos, and Karen McCluney ("Plaintiffs"), by and through their attorneys, on behalf of the Prisma Health Retirement Savings Plan f/k/a the Prisma Health-Upstate Retirement Savings Plan (the "403(b) Plan"), and the Prisma Health 401(a) Plan f/k/a the Prisma Health-Upstate 401(a) Plan (the "401(a) Plan"). Collectively, the 403(b) Plan and the 401(a) Plan are referred to as the "Plans".[1] themselves and all others similarly situated, state and allege as follows:

---

[1] The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants.

## I.     INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Prisma Health, Prisma Health Retirement Administrative Committee (the "Retirement Committee"), and Defined Contribution Retirement Plans Administrative Committee of Prisma Health and Affiliate Organizations (the "Administrative Committee") (collectively, the Retirement Committee and the Administrative Committee are referred to as the "Committees"). Collectively, the Company, the Retirement Committee, and the Administrative Committee are referred to as "Defendants."

2.      The Plans are defined contribution plans, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA. *See* Independent Auditor's Report ("Auditor's Report"), attached to 2024 Form 5500 for the 403(b) Plan, at 7 ("The [403(b)] Plan is a 403(b) defined contribution plan covering substantially all employees of Prisma Health (the "Employer")."); *see also* Auditor's Report, attached to 2024 Form 5500 for the 401(a) Plan, at 7 ("The [401(a)] Plan is a 401(a) defined contribution plan covering substantially all employees of Prisma Health - Upstate (the "Employer").").

3.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Tatum v. RJR Pension Investment Committee et al.*, 761 F.3d 346, 356 (4th Cir. 2014).

4.      The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2[2]; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

6.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

7.      The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the

---

[2]  Available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited January 13, 2026).

[3]  *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

8.      Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties it owed to the Plans, to Plaintiffs, and to the other participants in the Plans by, *inter alia*, failing to objectively and adequately review the Plans' investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

9.      At all times during the Class Period, the 403(b) Plan had at least One and One-Half billion dollars in assets under management. At the 403(b) Plan's fiscal year end in 2020, the 403(b) Plan had $1,548,561,638 in assets under management that were/are entrusted to the care of the 403(b) Plan's fiduciaries. *See* 2020 Form 5500 for the 403(b) Plan, Schedule H, at 2.

10.      By 2024, the 403(b) Plan had $2,165,121,786 in assets under management. *See* 2024 Form 5500 for the 403(b) Plan, Schedule H, at 2.

11.      At the 401(a) Plan's fiscal year end in 2020, the 401(a) Plan had $766,185,554 in assets under management that were/are entrusted to the 401(a) Plan's fiduciaries. *See* 2020 Form 5500 for the 401(a) Plan, Schedule H, at 2.

12.      By 2024, the 401(a) Plan had $938,584,818 in assets under management. *See* 2024 Form 5500 for the 401(a) Plan, Schedule H, at 2.

13.      The Plans are also large in terms of the number of their participants. At the beginning of the Class Period, the 403(b) Plan had 34,360 participants. *See* 2020 Form 5500 for the 403(b) Plan, at 2. By 2024, the 403(b) Plan had 38,970 participants. *See* 2024 Form 5500 for the 403(b) Plan, at 2.

14.    At the beginning of the Class Period, the 401(a) Plan had 28,390 participants. *See* 2020 Form 5500 for the 401(a) Plan, at 2. In 2024, the 401(a) Plan had 28,336 participants. *See* 2024 Form 5500 for the 401(a) Plan, at 2.

15.    With regard to the Plans' investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a guaranteed investment contract ("GIC") in the Plans with lower crediting rates compared to available, similar investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

16.    Specifically, Defendants allowed substantial assets in the Plans to be invested in a Guaranteed Income Fund (the "Prisma Stable Value Fund"), a group annuity insurance contract with Prudential Retirement Insurance and Annuity Company ("Prudential").[4] The Prisma Stable Value Fund provided a significantly lower rate of return than other comparable investments that Defendants could have made available to Plan participants.

17.    A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

18.    Prudential/Empower benefited significantly from Plan participants being invested in the Prisma Stable Value Fund. A prudent fiduciary who adequately monitored the Plans' investments and placed the interests of participants in the Plans above all would have recognized that the Prisma Stable Value Fund was benefiting Prudential/Empower at the expense of the

---

[4] "On April 1, 2022, Empower Annuity Insurance Company of America, formerly known as Great-West Life & Annuity Insurance Company, the parent company of Empower Retirement, LLC (Empower) acquired the full-service retirement business of Prudential Financial, Inc. In October of 2022, Empower renamed certain acquired entities, including Prudential Retirement Insurance and Annuity Company, which has become Empower Annuity Insurance Company ["Empower"]." Auditor's Report, attached to 2022 Form 5500 for the 403(b) Plan, at 7 and Auditor's Report, attached to 2022 Form 5500 for the 401(a) Plan, at 7.

participants in the Plans. The assets invested in the Prisma Stable Value Fund were held and invested by Prudential/Empower, which kept the spread (the difference between the amount Prudential/Empower earned on the investments and the amount Prudential/Empower paid to the Plans' participants) where applicable. The crediting rates that Prudential/Empower provided to the Plans were and are so low that Prudential/Empower reaped a windfall on the spread.

19.     Plaintiffs also allege that the Defendants engaged in prohibited transactions with a party-in-interest. Specifically, Defendants breached their fiduciary duties of prudence by allowing a party-in-interest, Prudential/Empower,[5] to benefit from its provision of services to the Plan by receiving excessive compensation for managing the Prisma Stable Value Fund.

20.     The arrangements and transactions with Prudential/Empower are prohibited transactions because they "amount[] to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

21.     Defendants' mismanagement of the Plans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plans and their participants millions of dollars.

22.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II) and violations of ERISA's prohibited transactions (Counts III).

---

[5] "Certain Plan investments are managed by [Empower] and VALIC, the custodians as defined by the Plan and, therefore, these transactions qualify as party in interest transactions." Auditor's Report, attached to 2024 Form 5500 for the 403(b) Plan, at 12 and Auditor's Report, attached to 2024 Form 5500 for the 401(a) Plan, at 13.

## II.   JURISDICTION AND VENUE

23.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.*

24.   This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

25.   Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.   PARTIES

### Plaintiffs

26.   Plaintiff, Jasmine Mullins ("Mullins") resides in Greenville, South Carolina. During her employment, Plaintiff Mullins participated in the 403(b) Plan and the 401(a) Plan. Ms. Mullin invested in the Prisma Stable Value Fund in the Plans and suffered injury to her Plan accounts due to underperformance of the Prisma Stable Value Fund.

27.   Plaintiff, Kevin Mole ("Mole") resides in Columbia, South Carolina. During his employment, Plaintiff Mole participated in the 403(b) Plan and the 401(a) Plan. Mr. Mole invested in the Prisma Stable Value Fund in the Plans and suffered injury to his Plan accounts due to underperformance of the Prisma Stable Value Fund.

28.     Plaintiff, Laura Gilstrap ("Gilstrap") resides in Lyman, South Carolina. During her employment, Plaintiff Gilstrap participated in the 403(b) Plan and the 401(a) Plan. Ms. Gilstrap invested in the Prisma Stable Value Fund in the Plans and suffered injury to her Plan accounts due to underperformance of the Prisma Stable Value Fund.

29.     Plaintiff, Reginald Wells ("Wells") resides in Columbia, South Carolina. During his employment, Plaintiff Wells participated in the 403(b) Plan and the 401(a) Plan. Mr. Wells invested in the Prisma Stable Value Fund in the Plans and suffered injury to his Plan accounts due to underperformance of the Prisma Stable Value Fund.

30.     Plaintiff, Sabrena Alexander ("Alexander") resides in Fountain Inn, South Carolina. During her employment, Plaintiff Alexander participated in the 403(b) Plan and the 401(a) Plan. Ms. Alexander invested in the Prisma Stable Value Fund in the Plans and suffered injury to her Plan accounts due to underperformance of the Prisma Stable Value Fund.

31.     Plaintiff, Stephanie Ramos ("Ramos") resides in Easley, South Carolina. During her employment, Plaintiff Ramos participated in the 403(b) Plan and the 401(a) Plan. Ms. Ramos invested in the Prisma Stable Value Fund in the Plans and suffered injury to her Plan accounts due to underperformance of the Prisma Stable Value Fund.

32.     Plaintiff, Karen McCluney ("McCluney") resides in Lexington, South Carolina. During her employment, Plaintiff McCluney participated in the 403(b) Plan. Ms. McCluney invested in the Prisma Stable Value Fund in the 403(b) Plan and suffered injury to her Plan account due to underperformance of the Prisma Stable Value Fund.

33.     Plaintiffs have standing to bring this action on behalf of the Plans because they participated and invested in the Plans and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts

currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

34.     Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

### Defendants

#### Company Defendant

35.     Prisma Health is the Plan sponsor and a Plan administrator with a principal place of business at 300 E. McBee Avenue, Greenville, South Carolina. *See* 2024 Form 5500 for the 403(b) Plan, at 1; 2024 Form 5500 for the 401(a) Plan, at 1; *see also* 403(b) Plan Basic Plan Document #08 ("BPD"), at 85 ("**Named Fiduciary.** The Plan Administrator is the Named Fiduciary for the Plan, unless the Plan Administrator specifically names another person or persons as Named Fiduciary and the designated person accepts its responsibilities as Named Fiduciary in writing. The Plan must always have at least one Named Fiduciary.").

36.     "The Plan Administrator is responsible for the day-to-day administration and operation of the Plan. For example, the Plan Administrator maintains the Plan records, including your account information, provides you with the forms you need to complete for Plan participation, and directs the payment of your account at the appropriate time. The Plan Administrator will also allow you to review the formal Plan document and certain other materials related to the Plan. If you have any questions about the Plan or your participation, you should contact the Plan Administrator. The Plan Administrator may designate other parties to perform some duties of the Plan Administrator, and some duties are the responsibility of the investment provider(s) to the

Plan." Prisma Health Retirement Savings Plan Summary Plan Description, October 1, 2024 ("SPD"), at 16.

37.     "The Plan Administrator has the complete power, in its sole discretion, to determine all questions arising in connection with the administration, interpretation, and application of the Plan (and any related documents and underlying policies). Any such determination by the Plan Administrator is conclusive and binding upon all persons." *Id*.

38.     Upon information and belief, the Company designated the members of the Retirement Committee and the Administrative Committee to perform certain duties of the Plan Administrator.

39.     Accordingly, Prisma Health, during the putative Class Period is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committees.

40.     For the foregoing reasons, the Company is a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**<u>Retirement Committee Defendants</u>**

41.     Prisma Health appointed the Retirement Committee to, among other things, administer the Plans and to select, monitor and evaluate the investment options utilized for the Plans. *See* Prisma Health Defined Contribution Retirement Plans, Investment Policy Statement ("IPS"), at 78.

42.     The Retirement Committee and each of its members during the putative Class Period are/were fiduciaries of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of assets in the Plans.

10

43. The Retirement Committee and unnamed members of the Retirement Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Retirement Committee Defendants."

**<u>Administrative Committee Defendants</u>**

44. Upon information and belief, Prisma Health appointed the Administrative Committee to, among other things, administer the Plans and to select, monitor and evaluate the investment options utilized for the Plans. *See* Auditor's Report, attached to 2024 Form 5500 for the 403(b) Plan, at 8 ("The Plan's Defined Contribution Retirement Plan Administrative Committee of Prisma Health and Affiliate Organizations determines the Plan's valuation policies utilizing information provided by the investment advisors."); Auditor's Report, attached to 2024 Form 5500 for the 401(a) Plan, at 9 (same).

45. The Administrative Committee and each of its members were fiduciaries of the Plans during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

46. The Administrative Committee and unnamed members of the Administrative Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Administrative Committee Defendants."

11

## IV.     CLASS ACTION ALLEGATIONS[6]

47.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[7]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Prisma Health Retirement Savings Plan f/k/a the Prisma Health-Upstate Retirement Savings Plan, and the Prisma Health 401(a) Plan f/k/a the Prisma Health-Upstate 401(a) Plan, at any time between March 16, 2020 through the date of judgment (the "Class Period").

48.     The members of the Class are so numerous that joinder of all members is impractical. The 2024 Form 5500 for the 403(b) lists 38,970 403(b) Plan "participants with account balances as of the end of the plan year." 2024 Form 5500 for the 403(b) Plan, at 2. The 2024 Form 5500 for the 401(a) Plan lists 28,336 401(a) Plan "participants with account balances as of the end of the plan year." 2024 Form 5500 for the 401(a) Plan, at 2.

49.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plans and have suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiffs consistently with other Class members and managed the Plans as single entities. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged

---

[6] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plans because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[7] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

50.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are/were fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether the Company failed to adequately monitor the Committees and other fiduciaries to ensure the Plans were being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

51.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

52.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to

13

individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

53.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

### A.     The 403(b) Plan

54.     The 403(b) Plan is a defined contribution plan covering substantially all eligible employees of Prisma Health. *See* Auditor's Report, attached to 2024 Form 5500 for the 403(b) Plan, at 7. ("The Plan is a 403(b) defined contribution plan covering substantially all employees of Prisma Health (the "Employer") who are not considered independent contractors. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).").

55.     Included in the Plan's available funds was the Prisma Stable Value Fund offered by Prudential/Empower. *See id*., at 11 ("The [403(b)] Plan invests in the Prisma Stable Value Fund … with EAICA.").

56.     At the end of 2020, $258,589,144 in 403(b) Plan assets were invested in the Prisma Stable Value Fund. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2020 Form 5500 for the 403(b) Plan, at 14.

57.     By the end of 2024, $244,632,654 in 403(b) Plan assets were invested in the Prisma Stable Value Fund. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2024 Form 5500 for the 403(b) Plan, at 14.

58.     The chart below demonstrates the amount of Plan assets invested in the Prisma Stable Value Fund during the Class Period.

| Plan Year | 403(b) Plan Assets in Prisma Stable Value Fund | Total Amount of 403(b) Plan Assets | 403(b) Plan Assets in Prisma Stable Value Fund as Percentage of Total Plan Assets |
|---|---|---|---|
| 2020 | $258,589,144 | $1,548,561,638 | 16.70% |
| 2021 | $264,813,204 | $1,786,109,962 | 14.83% |
| 2022 | $260,836,718 | $1,580,787,343 | 16.50% |
| 2023 | $248,393,600 | $1,879,344,092 | 13.22% |
| 2024 | $244,632,654 | $2,165,121,786 | 11.30% |

*Contributions*

59.     "As a Participant under the Plan, you may elect to reduce your compensation by a specific amount and have that amount contributed to the Plan as an elective deferral." SPD, at 2.

60.     There is an automatic contribution feature in the 403(b) Plan. *See id*. ("The Plan includes an automatic deferral feature. Accordingly, the Employer will automatically withhold a portion of your compensation from your pay each payroll period and contribute that amount to the Plan as salary deferral unless you make a contrary election.").

**B.     The 401(a) Plan**

61.     The 401(a) Plan is a defined contribution plan covering substantially all eligible employees of Prisma Health. *See* Auditor's Report, attached to 2024 Form 5500 for the 401(a) Plan, at 7. ("The Plan is a 401(a) defined contribution plan covering substantially all employees of Prisma Health - Upstate (the "Employer") who are not considered independent contractors and are not employed by Greenville Health Authority or Richland Memorial Hospital. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).").

62.     Included in the Plan's available funds was the Prisma Stable Value Fund offered by Prudential/Empower. *See id*., at 12 ("The [401(a)] Plan invests in the Prisma Stable Value Fund … with EAICA.").

63.     At the end of 2020, $127,936,978 in 401(a) Plan assets were invested in the Prisma Stable Value Fund. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2020 Form 5500 for the 401(a) Plan, at 14.

64.     By the end of 2024, $110,430,830 in 401(a) Plan assets were invested in the Prisma Stable Value Fund. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2024 Form 5500 for the 401(a) Plan, at 15.

65.     The chart below demonstrates the amount of Plan assets invested in the Prisma Stable Value Fund during the Class Period.

| Plan Year | 401(a) Plan Assets in Prisma Stable Value Fund | Total Amount of 401(a) Plan Assets | 401(a) Plan Assets in Prisma Stable Value Fund as Percentage of Total Plan Assets |
|---|---|---|---|
| 2020 | $127,936,978 | $766,185,554 | 16.70% |
| 2021 | $124,510,236 | $857,595,059 | 14.52% |
| 2022 | $121,525,475 | $722,418,332 | 16.82% |
| 2023 | $120,185,566 | $837,923,618 | 14.34% |
| 2024 | $110,430,830 | $938,584,818 | 11.77% |

***Contributions***

66.     "Each year, participants are eligible to receive a nonelective contribution from the Employer based on a participant's hours worked during the Plan year. Participants direct the investment of these contributions into various investment options offered by the Plan." Auditor's Report, attached to 2024 Form 5500 for the 401(a) Plan, at 7.

16

67. Further, "[t]he Employer may elect to make matching contributions to the [401(a)] Plan based on participants' contributions to a 403(b) Plan sponsored by the Employer." *Id*.

**VI. THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO SELECT AND MONITOR THE PRISMA STABLE VALUE FUND IN A PRUDENT MANNER**

**A. The Stable Value Fund in the Plans**

68. As indicated above, the Plans were invested in the Prisma Stable Value Fund, a proprietary stable value fund managed by Prudential/Empower.

69. A stable value fund is a conservative, fixed income investment vehicle that provides a relatively stable rate of return.[8]

70. Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[9]

71. The Prisma Stable Value Fund is thus a contract and not a mutual fund investment. To be sure, there are important differences between a mutual fund and stable value fund. Unlike mutual funds, stable value funds are defined by their predictability, they offer a set return on investment irrespective of management style, and their associated risk level is a creature of their structural design rather than their investment strategy.

---

[8] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

[9] *Id*.

72. There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account), like the Prisma Stable Value Fund; a separate account GIC; and a synthetic GIC (sometimes called a security backed investment contract).

73. Here, the Prisma Stable Value Fund is a traditional guaranteed investment contract that "meet[s] the fully benefit-responsive investment contract criteria and therefore [is] reported at contract value. Contract value is the relevant measure for fully benefit-responsive investment contracts because this is the amount received by participants if they were to initiate permitted transactions under the terms of the Plan. Contract value, as reported to the Plan by EAICA …, represents contributions made under the contract, plus earnings, less participant withdrawals, and administrative expenses." Auditor's Reports, attached to 2024 Form 5500s for the 403(b) Plan and 401(a) Plan, at 12.

74. The Auditors' Reports attached to the 2024 Form 5500 for the Plans state as follows:

> ***The Plan invests in the Prisma Stable Value Fund … which [is a] type[] of guaranteed investment contract, with EAICA*** of $244,632,654 and $248,393,600 at December 31, 2024 and 2023, respectively … . EAICA … maintain[s] the contributions in [a] general account. The account[] [is] credited with earnings on the underlying investments and charged for participant withdrawals and administrative expenses. ***The guaranteed investment contract issuers are contractually obligated to repay the principal and a specified interest rate that is guaranteed to the Plan.*** The crediting rates are based on a formula established by the contract issuers but may not be less than one percent. ***The crediting rates are reviewed on a semi-annual basis for resetting at EAICA*** … . ***The guaranteed investment contracts do not permit the insurance company to terminate the agreement prior to the scheduled maturity dates***.
>
> ***These contracts meet the fully benefit-responsive investment contract criteria and therefore are reported at contract value.*** Contract value is the relevant measure for fully benefit-responsive investment contracts because this is the amount received by participants if they were to initiate permitted transactions under the terms of the Plan. Contract value, as reported to the Plan by EAICA …, represents contributions made under the contract, plus

earnings, less participant withdrawals, and administrative expenses. Participants may ordinarily direct the withdrawal or transfer of all or a portion of their investment at contract value.

***The Plan's ability to receive amounts due in accordance with fully benefit-responsive investment contracts is dependent on the third-party issuer's ability to meet its financial obligations***[.] ***The issuer's ability to meet its contractual obligations may be affected by future economic and regulatory developments***.

Certain events might limit the ability of the Plan to transact at contract value with the issuers. Such events include (1) amendments to the Plan documents (including complete or partial Plan termination or merger with another plan), (2) changes to the Plan's prohibition on competing investment options or deletion of equity wash provisions, (3) bankruptcy of the Plan sponsor or other Plan sponsor events (for example, divestitures or spin-offs of a subsidiary) that cause a significant withdrawal from the Plan, (4) the failure of the trust to qualify for exemption from federal income taxes or any required prohibited transaction exemption under ERISA, or (5) premature termination of the contract. ***No events are probable of occurring that might limit the ability of the Plan to transact at contract value with the contract issuers and that also would limit the ability of the Plan to transact at contract value with the participants***.

Auditor's Reports attached to the 2024 Form 5500 for the 403(b) Plan, at 11-12 and the 401(a)

Plan, at 12-13 (emphasis added).

75.     Benefit responsive means that the participants can initiate transactions, such as withdrawals, at book value without adjustment.

76.     For the above reasons, the Prisma Stable Value Fund's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive; (2) whose contracts are with creditworthy insurance carriers; and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date. The Prisma Stable Value Fund's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at

the contract value like the Prisma Stable Value Fund, therein making stated risk considerations equivalent.

77.    As discussed below, Defendants' selection of the imprudent Prisma Stable Value Fund was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

**B.    Defendants Failed ERISA's High Standards Regarding Process and Methodology for Evaluating Investments**

78.    As described in the "Parties" section above, Defendants were fiduciaries of the Plans.

79.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

80.    As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

20

81.     The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[10]

82.     Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a retirement plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

83.     Reasonable prudent monitoring of stable value funds like GICs requires fiduciaries to evaluate the terms and conditions of the GIC contracts, research the relevant market, and test the market by, among other things, issuing requests for information and proposals from competing GIC providers.

84.     In the case of stable value options, there is not one commonly accepted and publicly available index in which to compare GICs.  In fact, the IPS for the 403(b) Plan lists no benchmark for the Prisma Stable Value Fund.  Instead, the IPS simply states a "If stable value or other stable principal investment options are utilized, the Committee may consider the following in its selection and monitoring process:

- Financial ratings of the issuer and/or insurance wrap provider(s)
- Composition of the underlying portfolio, including security type, duration, credit quality, and additional statistics as available
- History of portfolio crediting rates and/or performance
- Changes in company and/or management structure
- Plan level liquidity provisions"

---

[10] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

21

IPS at 81.

85.     Accordingly, the measurement of stable value funds, and specifically the Prisma Stable Value Fund, against prudently managed alternative stable value funds is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

86.     Indeed, "peer comparison is one of the most widely used and accepted methods of equity analysis used by professional analysts, individual investors, and professionals."[11]

87.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

88.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

89.     It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

90.     To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement o, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

---

[11] *See* https://www.investopedia.com/terms/p/peer-group.asp (last visited Jan. 29, 2026).

22

91.    Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plans' investments and fees because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

92.    In fact, in an attempt to discover the details of the Plans' mismanagement, Plaintiffs first wrote to the 403(b) Plan administrator on October 22, 2025 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

93.    By letter dated November 21, 2025, the 403(b) Plan's administrator responded to Plaintiffs' request. No meeting minutes, to the extent they exist, were produced in response to Plaintiffs' request. Nor was the investment management contract for the Prisma Stable Value Fund provided.

94.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary

23

fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

95.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

96.     In particular, Defendants failed to (1) consider the undue riskiness of the Prisma Stable Value Fund, and (2) failed to prudently monitor the Prisma Stable Value Fund, by among other things, determining readily available alternative stable value funds to replace the imprudent Prisma Stable Value Fund.

97.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Prisma Stable Value Fund in the Plans throughout the Class Period that wasted the assets of the Plans and the assets of participants because of unnecessary costs and underperformance.

**C.     Defendants Failed to Consider the Undue Riskiness of the Prisma Stable Value Fund**

98.     "When evaluating a traditional GIC, the most important consideration for the fiduciary- along with the contract terms- is the insurer's financial strength rating since an insurer's general account backs the guarantee that is at the core of this product."[12]

**1.     Prudential/Empower Pose A Severe Risk Of Becoming Insolvent**

**a.     The Securities and Exchange Commission Has Warned that Ratings from Credit Rating Agencies Are Unreliable**

---

[12] https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

99.    Because a guaranteed insurance account product – like the Prisma Stable Value Fund - is backed by the full faith and credit of the insurer, a focus must be placed on the creditworthiness of the insurer.  It used to be the belief that an insurer's financial strength could be determined in part from its ratings from the four major rating agencies. This is no longer the case.

100.    A June 7, 2023 Securities and Exchange statement declared that ratings issued by ratings agencies are not reliable.  It said these agencies shared blame for the 2008 financial crises:

> These entities' ratings were key to the marketing and sales of mortgage-backed securities, relied on by investors to make informed investment decisions — flaws and conflicts of interest notwithstanding. In some instances, Federal regulations required the use of credit ratings. As the 2011 report noted, the markets' — and, at times the federal government's — reliance on credit ratings that turned out to be highly misleading had consequences that reverberated "throughout the financial system." And not in a good way. …The Commission is replacing the references to credit ratings in Rules 101 and 102 of Regulation M with an alternative standard of creditworthiness that relies on credit risk models.

*See* https://www.sec.gov/newsroom/speeches-statements/lizarraga-statement-credit-ratings-060723

101.    The SEC's reference to reliable credit risk models is instructive. It is widely recognized that the two greatest risks faced by for-profit life insurance and annuity ("L&A") carriers are: (1) Higher Risk, Offshore Reinsurance and (2) Higher-Risk, Less-Liquid and Investment Concentrations.  *See generally*, September 13, 2022 Letter Submitted by Thomas D. Gober, Insurance and Reinsurance Fraud Expert, to The Hon. Sherrod C. Brown, Chairman

Committee on Banking, Housing, and Urban Affairs, at p. 57-68 (available at https://www.congress.gov/117/chrg/CHRG-117shrg53607/CHRG-117shrg53607.pdf)[13]

102.    These two higher-risk categories should always be compared against the L&A carrier's surplus, not total assets.  This credit risk model enables the reader (or Plan fiduciary) to better assess the degree to which those higher risks can be a real threat to the long-term viability of the L&A carrier.

### b.    Based on its Insufficient Surplus, Prudential/Empower Was/Is at Severe Risk of Insolvency

103.    Available surplus is the most relevant criteria for measuring insurance company credit worthiness for a number of reasons, the most pertinent of which is that surplus is the only buffer between a viable insurer and an insolvent one. In other words, if an asset must be written down, the total write-down comes out of surplus. That is why it is imprudent to have a thin surplus buffer relative to the carrier's risk profile.

104.    An important surplus adequacy benchmark ratio is the Surplus to Liabilities (S/L) Ratio. The higher the ratio, the better.  The national average for the L&A industry is roughly 7.5%. That average of 7.5% is significantly pulled down by some of the larger, aggressive private equity-controlled carriers with much lower ratios.  During the Class Period, Empower (and before it, Prudential), had an alarmingly low S/L ratio.  For example, as of 2024, Empower's S/L ratio was less than 1%:

---

[13] The letter to The Hon.  Sherrod C. Brown is found within "Current Issues in Insurance, Hearing Before the Committee on Banking, Housing, and Urban Affairs United States Senate, September 8, 2022, available at https://www.govinfo.gov/

**ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company**

## LIABILITIES, SURPLUS AND OTHER FUNDS

| | | 1 Current Year | 2 Prior Year |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 106,414,669,390 | 91,068,627,605 |
| 29. | Common capital stock | 2,500,000 | 2,500,000 |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | 0 | 0 |
| 32. | Surplus notes | 0 | |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | 943,498,537 | 943,498,537 |
| 34. | Aggregate write-ins for special surplus funds | 42,704,077 | 15,222,689 |
| 35. | Unassigned funds (surplus) | 29,697,164 | (24,056,237) |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | ___ shares common (value included in Line 29 $ ___) | | |
| 36.2 | ___ shares preferred (value included in Line 30 $ ___) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ ___ in Separate Accounts Statement) | 1,015,899,778 | 934,664,989 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 1,018,399,778 | 937,164,989 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 107,433,069,168 | 92,005,792,594 |

Total Surplus:      $      1,018,399,778      EAIC's 2024 Surplus to Liabilities
Total Liabilities:   $   106,414,669,390   Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:**      **0.96%**      National Average is About **7.5%**.

105.      There are numerous L&A carriers that have substantially higher S/L ratios than Empower.  For example, New York Life, at December 31, 2024, had (see below) $26.43 billion in surplus and $218.5 billion in liabilities. That yields a S/L ratio of 12.1%:

| | | | |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 218,473,153,964 | 206,607,540,338 |
| 29. | Common capital stock | | |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | | |
| 32. | Surplus notes | 4,233,167,821 | 4,232,366,504 |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | | |
| 34. | Aggregate write-ins for special surplus funds | 803,673,430 | 434,820,194 |
| 35. | Unassigned funds (surplus) | 21,390,599,996 | 20,626,889,733 |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | ___ shares common (value included in Line 29 $ ___) | | |
| 36.2 | ___ shares preferred (value included in Line 30 $ ___) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ ___ in Separate Accounts Statement) | 26,427,441,247 | 25,294,076,431 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 26,427,441,247 | 25,294,076,431 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 244,900,595,211 | 231,901,616,769 |

Total Surplus:      $    26,427,441,247   EAIC's 2024 Surplus to Liabilities
Total Liabilities:   $   218,473,153,964   Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:**      **12.10%**      National Average is About **7.5%**.

**c.      Prudential/Empower Is/Was Rendered Vulnerable Because of its Higher Risk, Offshore Reinsurance Compared to its Surplus**

106.      Specific to this matter, Empower entered into several significant reinsurance transactions with one offshore reinsurer. First, Empower ceded (Schedule S – Part 3 shown below) **$2.64 billion in Reserve Credit** (column 9) to Hannover Life Reassurance Company of America

27

(Bermuda) Ltd (HLRCA Bermuda). The "reserve credit" means that Empower has *deducted* that $2.64 billion from its liabilities because the reinsurer has reportedly *set up* that amount in liabilities on their end. As an offshore reinsurer, HLRCA Bermuda does not report to US regulators under US SAP (Statutory Accounting Principles). This lack of transparency is significant and makes it difficult, most often impossible, to determine how the reinsurer is accounting for the transaction on their end.



107.     Separate and in addition to the reserve credit reported above, Empower has also entered into a Modified Coinsurance (ModCo) reinsurance contract with HLRCA Bermuda. Note below, in column 14, that ModCo reinsurance balance was **$25.4 billion**:

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company

SCHEDULE S - PART 3 - SECTION 1

Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities Without Life or Disability Contingencies, and Related Benefits Listed by Reinsuring Company as of December 31, Current Year

| 1 NAIC Company Code | 2 ID Number | 3 Effective Date | 4 Name of Company | 5 Domi-ciliary Juris-diction | 6 Type of Reinsurance Ceded | 7 Type of Business Ceded | 8 Amount in Force at End of Year | 9 Current Year | 10 Prior Year | 11 Premiums | 12 Current Year | 13 Prior Year | 14 Modified Coinsurance Reserve |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00000 | AA-3191255 | 12/31/2022 | Hannover Life Reassur Co. of Amer (Bermuda) LTD | BMU | MCOFW/G | VA | 0 | 0 | 0 | 0 | 0 | 0 | 25,384,625,880 |

108.     The total reported balance of **both offshore contracts is $28 billion**. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:

28



109.     The end result of the above maneuvering is that Empower made it appear it had many billions less liabilities than it really had by purportedly off-loading its liabilities to a reinsurer.  There is no way to confirm the reinsurer's viability because the reinsurer is off-shore and does not report under statutory accounting in the United States.[14]

110.     Moreover, because HLRCA Bermuda does not report in the US in compliance with US statutes, under US SAP, it can't be determined what the "substance" of the transactions are and if HLRCA Bermuda has properly reserved for them. In fact, most technical industry media and numerous federal agencies have warned that the concern with offshore reinsurance, in addition

---

[14] *See* "Moody's Waves Yellow Flag as Worries Mount About Reinsurance Deals," by Warren S. Hersch, June 5, 2203 (quoting Moody's Investors Service as stating off-shore reinsurer "business provides less transparency for investors and is generally subject to less regulation than business that resides onshore in U.S.-regulated entity"  *See also* "FSOC raises alarm on insurers' use of offshore reinsurance," by Kenneth Araullo, May 10, 2025 (stating "The US Financial Stability Oversight Council (FSOC) has raised concerns about the financial stability of life insurers, citing increasingly complex investment strategies and a growing reliance on offshore reinsurers with less stringent     capital     requirements."),     available     at     https://www.insurance businessmag.com/reinsurance/news/breaking-news/fsoc-raises-alam-on-insuers-use-of-offshore-reinsurance-527931.aspx.

to the lack of transparency, is that a primary motive for going offshore is "regulatory arbitrage,"[15] meaning that the regulatory regime offshore allows less stringent reserving for liabilities, lower capital requirements and less asset quality restrictions. *See* n. 17.

        **d.**        **Prudential/Empower Is/Was rendered Vulnerable Because of its Higher Risk, Less-Liquid Investment Concentrations**

111.    Empower has a variety of higher-risk assets in significant concentrations relative to its surplus. At December 31, 2024, Empower reported a total of $4.3 billion in higher-risk, less traditional investments that are *not* reported under Long-Term Bonds. These include $3.75 billion in commercial mortgage loans and $552 million in "Other" invested assets and Derivatives, of which $236.5 million are notably affiliated. Under the Long-Term Bonds category, Empower reports another $3.8 billion in higher-risk, less liquid bond categories, including Residential Mortgage-Backed Securities (MBS), Commercial MBS, "Other Loan-Backed and Structured Securities."

112.    The combined total of the above-described investments is $8.1 billion. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:

---

[15] "Regulatory arbitrage is a practice whereby firms capitalize on loopholes in regulatory systems in order to circumvent unfavorable regulations. Arbitrage opportunities may be accomplished by a variety of tactics, including restructuring transactions, financial engineering and geographic relocation to amenable jurisdictions." Investopedia, found at https://www.investopedia.com/terms/r/regulatory-arbitrage.asp



113. Again, the inadequate surplus compared to the investment concentrations puts Empower in dire risk of insolvency, especially in light of the widely reported investment liquidity and valuation stresses today.

***

114. In short, Empower/Prudential's lack of adequate surplus compared to its true liabilities during the Class Period has put Empower/Prudential squarely at risk of insolvency thereby making any "guaranteed" investment contract not worth the paper it is written on.

**D.    The Prisma Stable Value Fund Materially Underperformed Relative to Comparator Stable Value Fund GICs**

115. The Prisma Stable Value Fund is imprudent for other reasons. Selecting and monitoring stable value products requires researching the relevant market, and testing the market by, among other things, issuing requests for proposals to solicit bid proposals. That is because stable value products are substantially similar in that their stated goal is to preserve income.

31

116.    Accordingly, it is a best practice for plans with substantial participant investments in stable value products to solicit competitive bids to initially select a stable value product, monitor opportunities in the marketplace on an ongoing basis, and periodically solicit competitive bids.

117.    The Plans' fiduciaries took no such steps. Had Defendants continually monitored and evaluated the Prisma Stable Value Fund's rates, they would have known, if they did not actually know, that the investment underperformed year after year for the entire Class Period compared to other comparable stable value funds.

118.     If Defendants had adopted and implemented a prudent process or policy, they could easily have selected or switched to another stable value fund with a proven track record of competitive returns.

119.    The terms of the Prisma Stable Value Fund allow for this action. The Prisma Stable Value Fund provides a guaranteed interest rate that is announced in advance and is guaranteed for a six-month period.[16] So at a minimum, every six months during the Class Period, Defendants had an opportunity to rectify their imprudent conduct and select another GIC with higher crediting rates. Moreover, the terms of the Prisma Stable Value Fund contract allowed Plans participants to withdraw their investments at full value[17] to invest elsewhere, like a prudent GIC alternative, if that choice had been made available to them by the Plans' fiduciaries.

---

[16] *See* Auditor's Reports, attached to 2024 Form 5500 for the 403(b) Plan, at 11, and 2024 Form 5500 for the 401(a) Plan, at 14 ("The crediting rates are reviewed on a semi-annual basis for resetting at [Empower].").

[17] *See* Auditor's Reports, attached to 2024 Form 5500 for the 403(b) Plan, at 12, and 2024 Form 5500 for the 401(a) Plan, at 14 ("Participants may ordinarily direct the withdrawal or transfer of all or a portion of their investment at contract value.").

120.   As stated above, the Prisma Stable Value Fund's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) whose contracts are with creditworthy insurance carriers, and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date. Additionally, the Prisma Stable Value Fund's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Prisma Stable Value Fund, therein making risk considerations equivalent.

121.   The Comparator Funds below meet these requirements.  Importantly, the Prisma Stable Value Fund had chronically underperforming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans.

122.   Defendants' selection of the imprudent Prisma Stable Value Fund was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

**1.     There are Many GICs in the Marketplace with Competitive Crediting Rates**

123.   The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

124.   Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plans, but were not selected by Defendants.

125.   As representative examples, these comparisons include:

- Auto-Owners Life Insurance Company ("AOLIC") provided a "fully benefit-responsive investment contract" for the Auto-Owners Insurance Company Retirement Savings Plan. Auditor's Report, attached to 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at 9. Further, like the Prisma Stable Value Fund, "[t]he plan administrator does not believe that the occurrence of and such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id.*, at 10. Finally, "[t]he guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id.*

- The Ameritas 401(k) Retirement Plan offered a "fully benefit-responsive" unallocated insurance contract with Ameritas Life Insurance Corp. Auditor's Report attached to the 2024 Form 5500 for the Ameritas 401(k) Retirement Plan, at 10. "Interest rate guarantees of the unallocated insurance contract are backed by assets held by the Company." *Id.* Like the Prisma Stable Value Fund, "[u]nder no event may the Company terminate this contract and settle at an amount different from contract value." *Id.*

- The Standard 401(k) Plan offered "a fully benefit-responsive investment contract ("FBRIC") with Standard [Insurance Company]." Auditor's Report attached to 2024 Form 5500 for The Standard 401(k) Plan. "The Plan's ability to receive amounts due is dependent on the issuer's ability to meet its financial obligations." *Id.* Like the Prisma Stable Value Fund, "The FBRIC does not permit the insurance company to terminate the agreements prior to the scheduled maturity date" and "[n]o events are probable of occurring that might limit the Plan's ability to transact at contract value with the contract issuer and that also would limit the ability of the Plan to transact at contract value with the participants." *Id.*

- The Ford Foundation Retirement Plan offered "a guaranteed fixed annuity contract" that was "fully and unconditionally guaranteed by TIAA." Auditor's Report, attached to 2024 Form 5500 for the Ford Foundation Retirement Plan, at 11. "The participant's principal, plus a specified minimum rate of interest, are guaranteed by TIAA's claims-paying ability." *Id.*, at 12.

- The Transamerica 401(k) Retirement Savings Plan offered "a fully benefit-responsive GIC with TFLIC, where TFLIC maintains the contributions in a general account." Auditor's Report, attached to 2024 Form 5500 for the Transamerica 401(k) Retirement Savings Plan, at 8. "The GIC issuer contractually must repay the principal and a specified interest rate that the issuer guarantees to the Plan." *Id.* Like the Prisma Stable Value Fund, "[t]he Company does not believe that the occurrence of any such events that would limit the Plan's ability to transact at contract value with participants is probable." *Id.*, at 9.

126.    Collectively, the GICs in the Auto-Owners Insurance Company Retirement Savings Plan, the Ameritas 401(k) Retirement Plan, The Standard 401(k) Plan, the Ford Foundation

Retirement Plan, and the Transamerica 401(k) Retirement Savings Plan are referred to as the "Comparator Funds."

127. The Prisma Stable Value Fund in the Plans is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans.

128. The Prisma Stable Value Fund's consistent underperformance was detrimental to Plan participants. Because of the compounding losses or gains of investments, prudent fiduciaries will compare relative performance of comparable investments, rather than just absolute performance. This is because even a "1%" difference causes exponential losses beyond what occurs "each year" because of the "lost investment opportunity" that a better performing fund "would have earned over time." *Tibble II*, 843 F.3d at 1198.

          a.      **The Prisma Stable Value Fund performed poorly when compared to the Comparator Funds at the Start of the Class Period**

129. In 2020, the Comparator Funds performed much better than the Prisma Stable Value Fund. Specifically, the Comparator Funds had an average calculated crediting rate of 3.57%. The calculated crediting rate for the Prisma Stable Value Fund in the 403(b) Plan was 2.39% in 2020, and the calculated crediting rate for the Prisma Stable Value Fund was 2.59% in 2020.

130. The table below demonstrates the underperformance of the Prisma Stable Value Fund compared to the Comparator Funds.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[18] |
|---|---|---|---|---|---|
| 2020 | Auto-Owners Insurance Company Retirement Savings Plan | 7,192 | $620,678,961 | Auto-Owners Insurance Company | 3.07% |
| | Ameritas 401(k) Retirement Plan | 3,553 | $708,127,755 | Ameritas Life Insurance | 3.48% |
| | The Standard 401(k) Plan | 4,554 | $920,504,787 | Standard Insurance | 3.23% |
| | Ford Foundation Retirement Plan | 228 | $292,861,235 | TIAA-CREF | 4.04% |
| | Transamerica 401(k) Retirement Savings Plan | 14,722 | $2,347,162,318 | Transamerica Financial Life | 3.27% |
| | **Prisma Health 403(b) Plan** | **34,630** | **$1,548,561,638** | **Prudential** | **2.39%** |
| | **Prisma Health 401(a) Plan** | **28,390** | **$766,185,554** | **Prudential** | **2.59%** |

131. In 2020, the Prisma Stable Value Fund in the 403(b) Plan underperformed the Comparator Funds by 30.08% and the Prisma Stable Value Fund in the 401(a) Plan underperformed the Comparator Funds by 24.22%.

132. Additionally, the Prisma Stable Value Fund underperformed other GICs with similar characteristics as the Prisma Stable Value Fund in 2020, as demonstrated in the table below.

---

[18] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | Alina 401(k) Retirement Savings Plan | 32,203 | $2,690,046,457 | Brighthouse Life Insurance Company | 3.72% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Prisma Health 403(b) Plan** | **34,630** | **$1,548,561,638** | **Prudential** | **2.39%** |
| | **Prisma Health 401(a) Plan** | **28,390** | **$766,185,554** | **Prudential** | **2.59%** |

**b.  The Prisma Stable Value Fund's Poor Performance Continued through 2021**

133.  As demonstrated in the table below, the Prisma Stable Value Fund's poor performance continued through 2021.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Auto-Owners Insurance Company Retirement Savings Plan | 7,480 | $711,146,156 | Auto-Owners Insurance Company | 3.02% |
| | Ameritas 401(k) Retirement Plan | 3,537 | $779,870,323 | Ameritas Life Insurance | 3.43% |

| | | | | | |
|---|---|---|---|---|---|
| | The Standard 401(k) Plan | 4,674 | $1,062,535,266 | Standard Insurance | 3.29% |
| | Ford Foundation Retirement Plan | 198 | $309,155,677 | TIAA-CREF | 3.56% |
| | Transamerica 401(k) Retirement Savings Plan | 14,065 | $2,563,127,214 | Transamerica Financial Life | 3.32% |
| | **Prisma Health 403(b) Plan** | **33,628** | **$1,786,109,962** | **Prudential** | **1.76%** |
| | **Prisma Health 401(a) Plan** | **30,023** | **$857,595,059** | **Prudential** | **1.82%** |

134. In 2021, the Prisma Stable Value Fund in the 403(b) Plan underperformed the Comparator Funds by 47.05% and the Prisma Stable Value Fund in the 401(a) Plan underperformed the Comparator Funds by 45.25%.

135. Additionally, the Prisma Stable Value Fund underperformed other GICs with similar characteristics as the Prisma Stable Value Fund in 2021, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |

38

| | | | | | |
|---|---|---|---|---|---|
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Prisma Health 403(b) Plan** | **33,628** | **$1,786,109,962** | **Prudential** | **1.76%** |
| | **Prisma Health 401(a) Plan** | **30,023** | **$857,595,059** | **Prudential** | **1.82%** |

        **c.**        **The Comparator Funds Outperformed the Prisma Stable Value Fund in 2022**

136.    As demonstrated in the table below, the Prisma Stable Value Fund's poor performance continued through 2022.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | Auto-Owners Insurance Company Retirement Savings Plan | 8,251 | $672,249,956 | Auto-Owners Insurance Company | 3.08% |
| | Ameritas 401(k) Retirement Plan | 3,779 | $636,210,578 | Ameritas Life Insurance | 3.30% |
| | The Standard 401(k) Plan | 4,832 | $931,024,946 | Standard Insurance | 3.22% |
| | Ford Foundation Retirement Plan | 174 | $261,575,612 | TIAA-CREF | 4.21% |
| | Transamerica 401(k) Retirement Savings Plan | 14,280 | $2,116,061,137 | Transamerica Financial Life | 3.23% |

39

| | | | | | |
|---|---|---|---|---|---|
| | Prisma Health 403(b) Plan | 35,311 | $1,580,787,343 | Prudential | 1.77% |
| | Prisma Health 401(a) Plan | 26,260 | $722,418,332 | Prudential | 1.81% |

137.   In 2022, the Prisma Stable Value Fund in the 403(b) Plan underperformed the Comparator Funds by 48.06% and the Prisma Stable Value Fund in the 401(a) Plan underperformed the Comparator Funds by 46.89%.

138.   Additionally, the Prisma Stable Value Fund underperformed other GICs with similar characteristics as the Prisma Stable Value Fund in 2022, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Alina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |

| | | | | | |
|---|---|---|---|---|---|
| | **Prisma Health 403(b) Plan** | **35,311** | **$1,580,787,343** | Prudential | **1.77%** |
| | **Prisma Health 401(a) Plan** | **26,260** | **$722,418,332** | Prudential | **1.81%** |

> **d.** **The Prisma Stable Value Fund's Poor Performance Continued through 2023**

139. As demonstrated in the table below, the Prisma Stable Value Fund's poor performance continued through 2023.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Insurance Company | 3.48% |
| | Ameritas 401(k) Retirement Plan | 3,686 | $741,588,807 | Ameritas Life Insurance | 3.66% |
| | The Standard 401(k) Plan | 5,371 | $1,129,069,194 | Standard Insurance | 3.64% |
| | Ford Foundation Retirement Plan | 126 | $287,214,199 | TIAA-CREF | 4.76% |
| | Transamerica 401(k) Retirement Savings Plan | 14,168 | $2,425,600,114 | Transamerica Financial Life | 3.79% |
| | **Prisma Health 403(b) Plan** | **38,628** | **$1,879,344,092** | **Empower** | **0.46%** |
| | **Prisma Health 401(a) Plan** | **32,021** | **$837,923,618** | **Empower** | **0.52%** |

140. In 2023, the Prisma Stable Value Fund in the 403(b) Plan underperformed the Comparator Funds by 88.10% and the Prisma Stable Value Fund in the 401(a) Plan underperformed the Comparator Funds by 86.55%.

141. Additionally, the Prisma Stable Value Fund underperformed other GICs with similar characteristics as the Prisma Stable Value Fund in 2023, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **Prisma Health 403(b) Plan** | **38,628** | **$1,879,344,092** | **Empower** | **0.46%** |
| | **Prisma Health 401(a) Plan** | **32,021** | **$837,923,618** | **Empower** | **0.52%** |

**e.** **The Comparator Funds Outperformed the Prisma Stable Value Fund in 2024**

142. In 2024, the Comparator Funds outperformed the Prisma Stable Value Fund.

42

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2024 | Auto-Owners Insurance Company Retirement Savings Plan | 8,950 | $864,332,421 | Auto-Owners Insurance Company | 3.40% |
| | Ameritas 401(k) Retirement Plan | 3,632 | $821,792,248 | Ameritas Life Insurance | 3.91% |
| | The Standard 401(k) Plan | 5,845 | $1,332,816,995 | Standard Insurance | 4.01% |
| | Ford Foundation Retirement Plan | 90 | $298,370,091 | TIAA-CREF | 4.59% |
| | Transamerica 401(k) Retirement Savings Plan | 13,910 | $2,720,479,704 | Transamerica Financial Life | 3.86% |
| | **Prisma Health 403(b) Plan** | **38,970** | **$2,165,121,786** | **Empower** | **3.94%** |
| | **Prisma Health 401(a) Plan** | **28,336** | **$938,584,818** | **Empower** | **3.86%** |

143. In 2023, the Prisma Stable Value Fund in the 403(b) Plan underperformed the Comparator Funds by 0.35% and the Prisma Stable Value Fund in the 401(a) Plan underperformed the Comparator Funds by 2.38%.

144. Additionally, the Prisma Stable Value Fund underperformed other GICs with similar characteristics as the Prisma Stable Value Fund in 2024, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| | Martignetti Companies, LLC 401(k) Plan | 1,160 | $240,540,763 | Massachusetts Mutual Life Ins. Co. | 4.35% |
| | Northeast Medical Services Profit Sharing 401(k) Plan | 1,467 | $174,979,442 | New York Life Ins. Co. | 4.58% |
| | **Prisma Health 403(b) Plan** | **38,970** | **$2,165,121,786** | **Empower** | **3.94%** |
| | **Prisma Health 401(a) Plan** | **28,336** | **$938,584,818** | **Empower** | **3.86%** |

145.   Throughout the Class Period, the Prisma Stable Value Fund underperformed the Comparator Funds by an average of over 42% in the 403(b) Plan and by an average of over 41% in the 401(a) Plan as demonstrated in the table below.

| Year | Prisma Stable Value Fund Rate of Return in the 403(B) Plan | Prisma Stable Value Fund Rate of Return in the 401(a) Plan | Comparator Funds Average Rate of Return | Prisma Stable Value Fund Percentage of Under-performance in the 403(b) Plan | Prisma Stable Value Fund Percentage of Under-performance in the 401(a) Plan |
|---|---|---|---|---|---|
| 2020 | 2.39% | 2.59% | 3.42% | 30.08% | 24.22% |
| 2021 | 1.76% | 1.82% | 3.32% | 47.05% | 45.25% |
| 2022 | 1.77% | 1.81% | 3.41% | 48.06% | 46.89% |
| 2023 | 0.46% | 0.52% | 3.87% | 88.10% | 86.55% |
| 2024 | 3.94% | 3.86% | 3.95% | 0.35% | 2.38% |
| Average Underperformance during Class Period | | | | 42.73% | 41.06% |

146.   The dramatic disparities between crediting rates in all years, especially 2020 through 2023, demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the Prisma Stable Value Fund's dismal crediting rate.

147. Again, the specific Comparator Funds used herein had similar risk considerations based on its terms and the creditworthiness of its insurance carriers. The Comparator Funds were fully benefit-responsive.

148. In short, because the Plans held over $2 billion combined in assets under management throughout the Class Period, they had considerable leverage to bargain for higher crediting rates.

149. A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates and/or by submitting requests for proposals to Prudential/Empower and other providers of stable value investments.

150. By selecting the Prisma Stable Value Fund with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

151. With the significant amount of assets under management in the Prisma Stable Value Fund, the losses suffered by Plan participants were devastating costing the Plans and their participants millions of dollars. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[19]

152. In sum, the Prisma Stable Value Fund in the Plans are general account products that should have had a high crediting rate given their riskiness, yet they had underwhelming crediting

---

[19] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

rates when compared against GICs with similar riskiness provided by other comparable carriers for other retirement plans.

153. Given the Plans' substantial stable value investment assets, reasonably prudent monitoring of the Prisma Stable Value Fund required Defendants to evaluate the terms and conditions of the GIC contract, research the relevant market, and test the market by, among other things, issuing requests for information and proposals from competing stable value providers. All of which they failed to do.

## VII.     ERISA'S PROHIBITED TRANSACTIONS PROVISIONS

154. Restrictions under ERISA prohibit fiduciaries from causing the Plans to engage in transactions with themselves or other fiduciaries or parties-in-interest. *See* 29 U.S.C. § 1106(a)-(b). Section 1106(a)(1) states, in pertinent part:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A)     sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> . . .
>
> (C)     furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

155. Section 1106(b) further provides, in pertinent part:

> A fiduciary with respect to the plan shall not –
>
> (1)     deal with the assets of the plan in his own interest or for his own account,
>
> (2)     in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party)

> whose interests are adverse to the interest of the plan or the interests of its participants or beneficiaries, or

> (3)   receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

156.   During the Class Period, Defendants allowed Plan assets to be invested in the Prisma Stable Value Fund that performed poorly when compared to other investments that were available, and knowing that Prudential/Empower, or its affiliates, were/are offering recordkeeping and trustee services to the Plans.

157.   Prudential/Empower was a party in interest[20] to the Plans as it was receiving compensation for managing/maintaining the Prisma Stable Value Fund, as well as indirect compensation from the spread – the difference between the amount Prudential/Empower earned on the investments and the amount Prudential/Empower paid to Plan participants.

158.   As an alternative to investing Plan assets in the Prisma Stable Value Fund, the Plans could have invested assets in better performing investments with the same investment strategies and goals. Defendants failed to consider this approach because it would have eliminated the compensation earned by Prudential/Empower.

159.   Defendants did not prudently and objectively evaluate the Prisma Stable Value Fund in the interests of Plan participants, as prudent fiduciaries would do. Rather, Defendants selected the Prisma Stable Value Fund in order to benefit Prudential/Empower and its affiliates.

160.   The Plans' sizeable investments in the Prisma Stable Value Fund provided Prudential/Empower a substantial amount of compensation at the expense of Plan participants.

---

[20] "Certain Plan investments are managed by [Empower] and VALIC, the custodians as defined by the Plan and, therefore, these transactions qualify as party in interest transactions." Auditor's Report, attached to 2024 Form 5500 for the 403(b) Plan, at 12 and Auditor's Report, attached to 2024 Form 5500 for the 401(a) Plan, at 13.

## COUNT I
### Breaches of Fiduciary Duty of Prudence
**(against the Retirement Committee and Administrative Committee Defendants)**

161. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

162. At all relevant times, the Retirement Committee and the Administrative Committee, and their members ("Prudence Defendants") were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

163. As fiduciaries of the Plans, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plans for the sole and exclusive benefit of Plans' participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

164. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Prisma Stable Value Fund based solely on the merits of the investment and what was in the best interest of Plans' participants. Instead, the Prudence Defendants selected and retained the Prisma Stable Value Fund in the Plans despite poor performance in relation to other comparable investments.

165. As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Prisma Stable Value Fund, the Plans suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their

fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

166.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plans all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

167.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries**
**(against the Company)**

168.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

169.    Prisma Health (the "Monitoring Defendant") had the authority to appoint and remove members of the Retirement Committee and Administrative Committee, and the duty to monitor the Retirement Committee and Administrative Committee and was aware that the Retirement Committee and Administrative Committee had critical responsibilities as fiduciaries of the Plans.

170.    In light of this authority, the Monitoring Defendant had a duty to monitor the Retirement Committee and Administrative Committee to ensure that the Retirement Committee and Administrative Committee were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plans in the event that the Retirement Committee and Administrative Committee were not fulfilling those duties.

171. The Monitoring Defendant also had a duty to ensure that the members of the Retirement Committee and Administrative Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plans' investments; and reported regularly to the Company.

172. The Monitoring Defendant breached its fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Retirement Committee and Administrative Committee or have a system in place for doing so, standing idly by as the Plans suffered significant losses as a result of the Retirement Committee and Administrative Committee's imprudent actions and omissions.

173. As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars in losses. Had the Monitoring Defendant complied with its fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

174. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plans all losses caused by its failure to adequately monitor the Retirement Committee and Administrative Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**COUNT III**
**PROHIBITED TRANSACTION**
**(against all Defendants)**

175. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

176. Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C).

177. Defendants were at all times fiduciaries to the Plans.

178. ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

179. Defendants caused the Plans to engage in the annuity transactions with actual or constructive knowledge that the transactions constituted a direct or indirect exchange of property between the Plans and Prudential/Empower.

180. Defendants also caused the Plans to engage in the annuity transactions with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between Prudential/Empower and the Plans.

181. When Defendants caused the Plans to engage in the annuity transaction, Prudential/Empower was a party in interest, including because Prudential/Empower, or its affiliate, was a person providing recordkeeping and trustee services to the Plans. 29 U.S.C. § 1002(14). Defendants knew of that fact when they caused the Plans to engage in the annuity transaction.

182. These transactions occurred each time the Plans paid fees to Prudential/Empower in connection with the Plans' investments in the Prisma Stable Value Fund and other proprietary options that paid revenue sharing to Prudential/Empower.

183.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plans, are liable to restore to the Plans all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a

52

constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.    Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of Plans' fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated: March 16, 2026                     Respectfully submitted,

*/s/ Nekedia Heath*
Nekedia Heath, Esquire
S.C. Bar #13991
**HEATH LAW, LLC**
311 Pettigru Street
Greenville, SC  29601
Email:  nekedia@heathlaw.org
Tel.: (864) 214-3132

Mark K. Gyandoh, Esquire
PA Attorney ID #88587
(*Pro Hac Vice* to be Requested)

James A. Maro, Esquire
PA Attorney ID #86420
(*Pro Hac Vice* to be Requested*)*
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
           jamesm@capozziadler.com
Tel.: (610) 890-0200

*Counsel for Plaintiffs and the Putative Class*

54