**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| JASMINE MULLINS, KEVIN MOLE, LAURA GILSTRAP, REGINALD WELLS, SABRENA ALEXANDER, STEPHANIE RAMOS, KAREN MCCLUNEY, and MICHELE BECERRA individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>PRISMA HEALTH, PRISMA HEALTH RETIREMENT ADMINISTRATIVE COMMITTEE, DEFINED CONTRIBUTION RETIREMENT PLANS ADMINISTRATIVE COMMITTEE OF PRISMA HEALTH AND AFFILIATE ORGANIZATIONS, and JOHN DOES 1-20,<br><br>Defendants. | **CIVIL ACTION NO.: 6:26-cv-01092-JDA** |

**CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs, Jasmine Mullins, Kevin Mole, Laura Gilstrap, Reginald Wells, Sabrena Alexander, Stephanie Ramos, Karen McCluney, and Michele Becerra ("Plaintiffs"), by and through their attorneys, on behalf of the Prisma Health Retirement Savings Plan f/k/a the Prisma Health-Upstate Retirement Savings Plan (the "403(b) Plan"), and the Prisma Health 401(a) Plan f/k/a the Prisma Health-Upstate 401(a) Plan (the "401(a) Plan"). Collectively, the 403(b) Plan and the 401(a) Plan are referred to as the "Plans"[1] themselves and all others similarly situated, state and allege as follows:

[1] The Plans are legal entities that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants.

# I. INTRODUCTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Prisma Health, Prisma Health Retirement Administrative Committee (the "Retirement Committee"), and Defined Contribution Retirement Plans Administrative Committee of Prisma Health and Affiliate Organizations (the "Administrative Committee") (collectively, the Retirement Committee and the Administrative Committee are referred to as the "Committees"). Collectively, the Company, the Retirement Committee, and the Administrative Committee are referred to as "Defendants."

2. The Plans are defined contribution plans, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA. *See* Independent Auditor's Report ("Auditor's Report"), attached to 2024 Form 5500 for the 403(b) Plan, at 7 ("The [403(b)] Plan is a 403(b) defined contribution plan covering substantially all employees of Prisma Health (the "Employer")."); *see also* Auditor's Report, attached to 2024 Form 5500 for the 401(a) Plan, at 7 ("The [401(a)] Plan is a 401(a) defined contribution plan covering substantially all employees of Prisma Health - Upstate (the "Employer").").

3. To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Tatum v. RJR Pension Investment Committee et al.*, 761 F.3d 346, 356 (4th Cir. 2014).

4. The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2[2]; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5. The Supreme Court states that in interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

6. Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plans, to Plaintiffs, and to the other participants in the Plans by, *inter alia*, failing to objectively and adequately review the Plans' investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

7. At all times during the Class Period, the 403(b) Plan had at least One and One-Half Billion Dollars in assets under management. At the 403(b) Plan's fiscal year end in 2020, the

[2] Available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited January 13, 2026).

403(b) Plan had $1,548,561,638 in assets under management that were/are entrusted to the care of the 403(b) Plan's fiduciaries. *See* 2020 Form 5500 for the 403(b) Plan, Schedule H, at 2.

8. By 2024, the 403(b) Plan had $2,165,121,786 in assets under management. *See* 2024 Form 5500 for the 403(b) Plan, Schedule H, at 2.

9. At the 401(a) Plan's fiscal year end in 2020, the 401(a) Plan had $766,185,554 in assets under management that were/are entrusted to the 401(a) Plan's fiduciaries. *See* 2020 Form 5500 for the 401(a) Plan, Schedule H, at 2.

10. By 2024, the 401(a) Plan had $938,584,818 in assets under management. *See* 2024 Form 5500 for the 401(a) Plan, Schedule H, at 2.

11. The Plans are also large in terms of the number of their participants. At the beginning of the Class Period, the 403(b) Plan had 34,360 participants. *See* 2020 Form 5500 for the 403(b) Plan, at 2. By 2024, the 403(b) Plan had 38,970 participants. *See* 2024 Form 5500 for the 403(b) Plan, at 2.

12. At the beginning of the Class Period, the 401(a) Plan had 28,390 participants. *See* 2020 Form 5500 for the 401(a) Plan, at 2. In 2024, the 401(a) Plan had 28,336 participants. *See* 2024 Form 5500 for the 401(a) Plan, at 2.

13. With regard to the Plans' investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a guaranteed investment contract ("GIC") in the Plans with lower crediting rates compared to available, similar investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

14. Specifically, Defendants allowed substantial assets in the Plans to be invested in a Guaranteed Income Fund (the "Prisma Stable Value Fund"), a group annuity insurance contract

with Prudential Retirement Insurance and Annuity Company ("Prudential").[3] The Prisma Stable Value Fund provided a significantly lower rate of return than other comparable investments that Defendants could have made available to Plan participants.

15. A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

16. Prudential/Empower benefited significantly from Plan participants being invested in the Prisma Stable Value Fund. A prudent fiduciary who adequately monitored the Plans' investments and placed the interests of participants in the Plans above all would have recognized that the Prisma Stable Value Fund was benefiting Prudential/Empower at the expense of the participants in the Plans. The assets invested in the Prisma Stable Value Fund were held and invested by Prudential/Empower, which kept the spread (the difference between the amount Prudential/Empower earned on the investments and the amount Prudential/Empower paid to the Plans' participants) where applicable. The crediting rates that Prudential/Empower provided to the Plans were and are so low that Prudential/Empower reaped a windfall on the spread.

17. Plaintiffs also allege that Defendants breached their fiduciary duty of prudence by imprudently selecting and retaining higher-cost share "retail" classes of mutual funds instead of lower-cost "institutional" shares of the same funds. This form of imprudence manifested in Prisma

[3] "On April 1, 2022, Empower Annuity Insurance Company of America, formerly known as Great-West Life & Annuity Insurance Company, the parent company of Empower Retirement, LLC (Empower) acquired the full-service retirement business of Prudential Financial, Inc. In October of 2022, Empower renamed certain acquired entities, including Prudential Retirement Insurance and Annuity Company, which has become Empower Annuity Insurance Company ["Empower"]." Auditor's Report, attached to 2022 Form 5500 for the 403(b) Plan, at 7 and Auditor's Report, attached to 2022 Form 5500 for the 401(a) Plan, at 7. All references to "Prudential" and its affiliates throughout this complaint include the subsequently named Empower and its affiliates, where and when appropriate.

Health's selection of higher-priced "Class A" shares of the Clearbridge Large Cap Growth Fund ("Clearbridge"), the Western Asset Core Bond Fund ("Western"), and Putnam Large Cap Value Fund ("Putnam"). Each of these funds made cheaper share classes available to institutional plans, but Prisma Health chose more expensive options that provided no additional benefit to plan participants.

18. Plaintiffs also allege that the Defendants breached their duty of loyalty by choosing retail shares of mutual funds that kicked back excessive revenue-sharing fees to the Plans' recordkeeper, Empower Retirement, LLC ("Empower"), while causing plan participants to bear unnecessary costs.

19. Defendants' mismanagement of the Plans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plans and their participants millions of dollars.

20. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Counts I, II, and III), failure to monitor fiduciaries (Count IV) and violations of ERISA's prohibited transactions (Counts V).

## II. JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

22. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

23. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III. PARTIES

**Plaintiffs**

24. Plaintiff, Jasmine Mullins ("Mullins") resides in Greenville, South Carolina. During her employment, Plaintiff Mullins participated in the 403(b) Plan and the 401(a) Plan. Ms. Mullins held investments in the Plans that were offered and subject to the investment decisions, oversight, and processes of the Plans' fiduciaries. Ms. Mullins invested in the Clearbridge Large Cap Growth A Fund, the Putnam Large Cap Value A Fund, the Western Asset Core Bond A Fund, and the Prisma Stable Value Fund. She suffered injuries due to the underperformance and/or high fees of these assets.

25. Plaintiff, Kevin Mole ("Mole") resides in Columbia, South Carolina. During his employment, Plaintiff Mole participated in the 403(b) Plan and the 401(a) Plan. Mr. Mole held investments in the Plans that were offered and subject to the investment decisions, oversight, and processes of the Plans' fiduciaries. Mr. Mole invested in the Clearbridge Large Cap Growth A Fund, the Putnam Large Cap Value A Fund, the Western Asset Core Bond A Fund, and the Prisma

Stable Value Fund. He suffered injuries due to the underperformance and/or high fees of these assets.

26. Plaintiff, Laura Gilstrap ("Gilstrap") resides in Lyman, South Carolina. During her employment, Plaintiff Gilstrap participated in the 403(b) Plan and the 401(a) Plan. Ms. Gilstrap held investments in the Plans that were offered and subject to the investment decisions, oversight, and processes of the Plans' fiduciaries. Ms. Gilstrap invested in the Clearbridge Large Cap Growth A Fund, the Putnam Large Cap Value A Fund, the Western Asset Core Bond A Fund, and the Prisma Stable Value Fund. She suffered injuries due to the underperformance and/or high fees of these assets.

27. Plaintiff, Reginald Wells ("Wells") resides in Columbia, South Carolina. During his employment, Plaintiff Wells participated in the 403(b) Plan and the 401(a) Plan. Mr. Wells held investments in the Plans that were offered and subject to the investment decisions, oversight, and processes of the Plans' fiduciaries. Mr. Wells invested in the Clearbridge Large Cap Growth A Fund, the Putnam Large Cap Value A Fund, the Western Asset Core Bond A Fund, and the Prisma Stable Value Fund. He suffered injuries due to the underperformance and/or high fees of these assets.

28. Plaintiff, Sabrena Alexander ("Alexander") resides in Fountain Inn, South Carolina. During her employment, Plaintiff Alexander participated in the 403(b) Plan and the 401(a) Plan. Ms. Alexander held investments in the Plans that were offered and subject to the investment decisions, oversight, and processes of the Plans' fiduciaries. Ms. Alexander invested in the Clearbridge Large Cap Growth A Fund, the Putnam Large Cap Value A Fund, the Western Asset Core Bond A Fund, and the Prisma Stable Value Fund. She suffered injuries due to the underperformance and/or high fees of these assets.

29. Plaintiff, Stephanie Ramos ("Ramos") resides in Easley, South Carolina. During her employment, Plaintiff Ramos participated in the 403(b) Plan and the 401(a) Plan. Ms. Ramos held investments in the Plans that were offered and subject to the investment decisions, oversight, and processes of the Plans' fiduciaries. Ms. Ramos invested in the Clearbridge Large Cap Growth A Fund, the Putnam Large Cap Value A Fund, the Western Asset Core Bond A Fund, and the Prisma Stable Value Fund. She suffered injuries due to the underperformance and/or high fees of these assets.

30. Plaintiff, Karen McCluney ("McCluney") resides in Lexington, South Carolina. During her employment, Plaintiff McCluney participated in the 403(b) Plan. Ms. McCluney held investments in the Plans that were offered and subject to the investment decisions, oversight, and processes of the Plans' fiduciaries. Ms. McCluney invested in the Clearbridge Large Cap Growth A Fund, the Putnam Large Cap Value A Fund, the Western Asset Core Bond A Fund, and the Prisma Stable Value Fund. She suffered injuries due to the underperformance and/or high fees of these assets.

31. Plaintiff, Michele Becerra ("Becerra") is a citizen and resident of New Mexico and participated in the 401(a) Plan and the 403(b) Plan. Ms. Becerra held investments in the Plans that were offered and subject to the investment decisions, oversight, and processes of the Plans' fiduciaries. Ms. Becerra invested in the Clearbridge Large Cap Growth A Fund, the Putnam Large Cap Value A Fund, the Western Asset Core Bond A Fund, and the Prisma Stable Value Fund. She suffered injuries due to the underperformance and/or high fees of these assets.

32. Plaintiffs have standing to bring this action on behalf of the Plans because they participated and invested in the Plans and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts

currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

33. Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

34. Prisma Health is the Plan sponsor and a Plan administrator with a principal place of business at 300 E. McBee Avenue, Greenville, South Carolina. *See* 2024 Form 5500 for the 403(b) Plan, at 1; 2024 Form 5500 for the 401(a) Plan, at 1; *see also* 403(b) Plan Basic Plan Document #08 ("BPD"), at 85 ("**Named Fiduciary.** The Plan Administrator is the Named Fiduciary for the Plan, unless the Plan Administrator specifically names another person or persons as Named Fiduciary and the designated person accepts its responsibilities as Named Fiduciary in writing. The Plan must always have at least one Named Fiduciary.").

35. "The Plan Administrator is responsible for the day-to-day administration and operation of the Plan. For example, the Plan Administrator maintains the Plan records, including your account information, provides you with the forms you need to complete for Plan participation, and directs the payment of your account at the appropriate time. The Plan Administrator will also allow you to review the formal Plan document and certain other materials related to the Plan. If you have any questions about the Plan or your participation, you should contact the Plan Administrator. The Plan Administrator may designate other parties to perform some duties of the Plan Administrator, and some duties are the responsibility of the investment provider(s) to the

Plan." Prisma Health Retirement Savings Plan Summary Plan Description, October 1, 2024 ("SPD"), at 16.

36. "The Plan Administrator has the complete power, in its sole discretion, to determine all questions arising in connection with the administration, interpretation, and application of the Plan (and any related documents and underlying policies). Any such determination by the Plan Administrator is conclusive and binding upon all persons." *Id*.

37. Upon information and belief, the Company designated the members of the Retirement Committee and the Administrative Committee to perform certain duties of the Plan Administrator.

38. Accordingly, Prisma Health, during the putative Class Period is/was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committees.

39. For the foregoing reasons, the Company is a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Retirement Committee Defendants**

40. Prisma Health appointed the Retirement Committee to, among other things, administer the Plans and to select, monitor and evaluate the investment options utilized for the Plans. *See* Prisma Health Defined Contribution Retirement Plans, Investment Policy Statement ("IPS"), at 78.

41. The Retirement Committee and each of its members during the putative Class Period are/were fiduciaries of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of assets in the Plans.

42. The Retirement Committee and unnamed members of the Retirement Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Retirement Committee Defendants."

**Administrative Committee Defendants**

43. Upon information and belief, Prisma Health appointed the Administrative Committee to, among other things, administer the Plans and to select, monitor and evaluate the investment options utilized for the Plans. *See* Auditor's Report, attached to 2024 Form 5500 for the 403(b) Plan, at 8 ("The Plan's Defined Contribution Retirement Plan Administrative Committee of Prisma Health and Affiliate Organizations determines the Plan's valuation policies utilizing information provided by the investment advisors."); Auditor's Report, attached to 2024 Form 5500 for the 401(a) Plan, at 9 (same).

44. The Administrative Committee and each of its members were fiduciaries of the Plans during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

45. The Administrative Committee and unnamed members of the Administrative Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Administrative Committee Defendants."

## IV. CLASS ACTION ALLEGATIONS[4]

[4] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plans because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

46. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Prisma Health Retirement Savings Plan f/k/a the Prisma Health-Upstate Retirement Savings Plan, and the Prisma Health 401(a) Plan f/k/a the Prisma Health-Upstate 401(a) Plan, at any time between March 16, 2020 through the date of judgment (the "Class Period").

47. The members of the Class are so numerous that joinder of all members is impractical. The 2024 Form 5500 for the 403(b) lists 38,970 403(b) Plan "participants with account balances as of the end of the plan year." 2024 Form 5500 for the 403(b) Plan, at 2. The 2024 Form 5500 for the 401(a) Plan lists 28,336 401(a) Plan "participants with account balances as of the end of the plan year." 2024 Form 5500 for the 401(a) Plan, at 2.

48. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plans and have suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiffs consistently with other Class members and managed the Plans as single entities. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

49. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether Defendants are/were fiduciaries of the Plan;

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

B. Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C. Whether Defendants breached their fiduciary duty of loyalty by engaging in the conduct described herein;

D. Whether the Company failed to adequately monitor the Committees and other fiduciaries to ensure the Plans were being managed in compliance with ERISA;

E. The proper form of equitable and injunctive relief; and

F. The proper measure of monetary relief.

50. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

51. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

52. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V. THE PLAN

### A. The 403(b) Plan

53. The 403(b) Plan is a defined contribution plan covering substantially all eligible employees of Prisma Health. *See* Auditor's Report, attached to 2024 Form 5500 for the 403(b) Plan, at 7. ("The Plan is a 403(b) defined contribution plan covering substantially all employees of Prisma Health (the "Employer") who are not considered independent contractors. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).").

54. Included in the Plan's available funds was the Prisma Stable Value Fund offered by Prudential/Empower. *See id*., at 11 ("The [403(b)] Plan invests in the Prisma Stable Value Fund … with EAICA.").

55. At the end of 2020, $258,589,144 in 403(b) Plan assets were invested in the Prisma Stable Value Fund. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2020 Form 5500 for the 403(b) Plan, at 14.

56. By the end of 2024, $244,632,654 in 403(b) Plan assets were invested in the Prisma Stable Value Fund. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2024 Form 5500 for the 403(b) Plan, at 14.

57. The chart below demonstrates the amount of Plan assets invested in the Prisma Stable Value Fund during the Class Period.

| Plan Year | 403(b) Plan Assets in Prisma Stable Value Fund | Total Amount of 403(b) Plan Assets | 403(b) Plan Assets in Prisma Stable Value Fund as Percentage of Total Plan Assets |
|---|---|---|---|
| 2020 | $258,589,144 | $1,548,561,638 | 16.70% |
| 2021 | $264,813,204 | $1,786,109,962 | 14.83% |
| 2022 | $260,836,718 | $1,580,787,343 | 16.50% |
| 2023 | $248,393,600 | $1,879,344,092 | 13.22% |
| 2024 | $244,632,654 | $2,165,121,786 | 11.30% |

***Contributions***

58. "As a Participant under the Plan, you may elect to reduce your compensation by a specific amount and have that amount contributed to the Plan as an elective deferral." SPD, at 2.

59. There is an automatic contribution feature in the 403(b) Plan. *See id*. ("The Plan includes an automatic deferral feature. Accordingly, the Employer will automatically withhold a portion of your compensation from your pay each payroll period and contribute that amount to the Plan as salary deferral unless you make a contrary election.").

***Recordkeeper***

60. Prior to on or about April 1, 2022, the recordkeeper for the 403(b) Plan was Prudential Financial, Inc., the parent of Prudential Bank & Trust, FSB ("Prudential").

On April 1, 2022, Empower Annuity Insurance Company of America—formerly known as Great-West Life & Annuity Insurance Company and the parent of Empower Retirement, LLC ("Empower")—acquired the full-service retirement business of Prudential.

61. All assets of the 403(b) Plan were transferred from Prudential to Empower on October 20, 2023. Empower is the current recordkeeper of the 403(b) Plan.

**B. The 401(a) Plan**

62. The 401(a) Plan is a defined contribution plan covering substantially all eligible employees of Prisma Health. *See* Auditor's Report, attached to 2024 Form 5500 for the 401(a) Plan, at 7. ("The Plan is a 401(a) defined contribution plan covering substantially all employees of Prisma Health - Upstate (the "Employer") who are not considered independent contractors and are not employed by Greenville Health Authority or Richland Memorial Hospital. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).").

63. Included in the Plan's available funds was the Prisma Stable Value Fund offered by Prudential/Empower. *See id.*, at 12 ("The [401(a)] Plan invests in the Prisma Stable Value Fund … with EAICA.").

64. At the end of 2020, $127,936,978 in 401(a) Plan assets were invested in the Prisma Stable Value Fund. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2020 Form 5500 for the 401(a) Plan, at 14.

65. By the end of 2024, $110,430,830 in 401(a) Plan assets were invested in the Prisma Stable Value Fund. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2024 Form 5500 for the 401(a) Plan, at 15.

66. The chart below demonstrates the amount of Plan assets invested in the Prisma Stable Value Fund during the Class Period.

| Plan Year | 401(a) Plan Assets in Prisma Stable Value Fund | Total Amount of 401(a) Plan Assets | 401(a) Plan Assets in Prisma Stable Value Fund as Percentage of Total Plan Assets |
|---|---|---|---|
| 2020 | $127,936,978 | $766,185,554 | 16.70% |
| 2021 | $124,510,236 | $857,595,059 | 14.52% |
| 2022 | $121,525,475 | $722,418,332 | 16.82% |
| 2023 | $120,185,566 | $837,923,618 | 14.34% |
| 2024 | $110,430,830 | $938,584,818 | 11.77% |

***Contributions***

67. "Each year, participants are eligible to receive a nonelective contribution from the Employer based on a participant's hours worked during the Plan year. Participants direct the investment of these contributions into various investment options offered by the Plan." Auditor's Report, attached to 2024 Form 5500 for the 401(a) Plan, at 7.

68. Further, "[t]he Employer may elect to make matching contributions to the [401(a)] Plan based on participants' contributions to a 403(b) Plan sponsored by the Employer." *Id*.

***Recordkeeper***

69. Prior to on or about April 1, 2022, the recordkeeper for the 401(a) Plan was Prudential.

On April 1, 2022, Empower acquired the full-service retirement business of Prudential.

70. All assets of the 401(a) Plan were transferred from Prudential to Empower on October 20, 2023. Empower is the current recordkeeper of the 401(a) Plan.

## VI. FACTUAL ALLEGATIONS

71. Plan fiduciaries ordinarily attempt to memorialize their investment selection and retention processes through an IPS. Depending on how it is structured, an IPS may reflect a prudent or imprudent process.

72. All Plan investments for the Prisma Health 401(a) and 403(b) Plans were managed by a single Committee guided by a single IPS. Prisma Health's IPS establishes criteria for monitoring investment options, including performance versus benchmarks, risk measures, Sharpe Ratios, Information Ratios, and expense ratios. Despite establishing these monitoring criteria, the Committee failed to apply them prudently and appears to have ignored these factors.

73. During the Class Period, the Committee engaged in three different categories of actions that breached the duties of prudence and/or loyalty, evidencing a flawed process for selecting and retaining investments:

- **Prudence**: Choosing higher-cost share Class A classes of mutual funds—the same class available to ordinary retail investors—instead of the same mutual funds' offering of lower-cost share classes, available only to institutional plans (selecting Class A shares of Clearbridge, Western Asset Core, and Putnam Funds).
- **Loyalty**: Choosing retail shares of mutual funds that kicked back fees to the Plans' recordkeeper, Empower, that bore no reasonable relation to its recordkeeping services but were instead paid based on Empower's role in getting the Plans to invest in these funds (selecting Class A shares of Clearbridge, Western, and Putnam Funds).
- **Prudence**: Failing to evaluate returns and risks against meaningful benchmarks and peers, resulting in the selection of severely under-performing options (Clearbridge, Western, John Hancock).

74. Plaintiffs are adequate class representatives as they invested in funds impacted by each breach of duty described above. Plaintiffs' quarterly account statements from Empower confirm that during the Class Period, Plaintiffs invested in at least the following funds within the Plans:

- Clearbridge Large Cap Growth – Class A.
- Western Asset Core Plus Bond – Class A.
- Putnam Equity Income – Class A.

## VII. THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO SELECT AND MONITOR THE PRISMA STABLE VALUE FUND IN A PRUDENT MANNER

### A. The Stable Value Fund in the Plans

75. As indicated above, the Plans were invested in the Prisma Stable Value Fund, a proprietary stable value fund managed by Prudential/Empower.

76. A stable value fund is a conservative, fixed income investment vehicle that provides a relatively stable rate of return.[6]

77. Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[7]

78. The Prisma Stable Value Fund is thus a contract and not a mutual fund investment. To be sure, there are important differences between a mutual fund and stable value fund. Unlike mutual funds, stable value funds are defined by their predictability, they offer a set return on investment irrespective of management style, and their associated risk level is a creature of their structural design rather than their investment strategy.

79. There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account), like the Prisma Stable Value Fund; a separate account GIC; and a synthetic GIC (sometimes called a security backed investment contract).

80. Here, the Prisma Stable Value Fund is a traditional guaranteed investment contract that "meet[s] the fully benefit-responsive investment contract criteria and therefore [is] reported at contract value. Contract value is the relevant measure for fully benefit-responsive investment contracts because this is the amount received by participants if they were to initiate permitted

---

[6] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

[7] *Id*.

transactions under the terms of the Plan. Contract value, as reported to the Plan by EAICA …, represents contributions made under the contract, plus earnings, less participant withdrawals, and administrative expenses." Auditor's Reports, attached to 2024 Form 5500s for the 403(b) Plan and 401(a) Plan, at 12.

81. The Auditors' Reports attached to the 2024 Form 5500 for the Plans state as follows:

> ***The Plan invests in the Prisma Stable Value Fund … which [is a] type[] of guaranteed investment contract, with EAICA*** of $244,632,654 and $248,393,600 at December 31, 2024 and 2023, respectively … . EAICA … maintain[s] the contributions in [a] general account. The account[] [is] credited with earnings on the underlying investments and charged for participant withdrawals and administrative expenses. ***The guaranteed investment contract issuers are contractually obligated to repay the principal and a specified interest rate that is guaranteed to the Plan.*** The crediting rates are based on a formula established by the contract issuers but may not be less than one percent. ***The crediting rates are reviewed on a semi-annual basis for resetting at EAICA*** … . ***The guaranteed investment contracts do not permit the insurance company to terminate the agreement prior to the scheduled maturity dates***.
>
> ***These contracts meet the fully benefit-responsive investment contract criteria and therefore are reported at contract value.*** Contract value is the relevant measure for fully benefit-responsive investment contracts because this is the amount received by participants if they were to initiate permitted transactions under the terms of the Plan. Contract value, as reported to the Plan by EAICA …, represents contributions made under the contract, plus earnings, less participant withdrawals, and administrative expenses. Participants may ordinarily direct the withdrawal or transfer of all or a portion of their investment at contract value.
>
> ***The Plan's ability to receive amounts due in accordance with fully benefit-responsive investment contracts is dependent on the third-party issuer's ability to meet its financial obligations***[.] ***The issuer's ability to meet its contractual obligations may be affected by future economic and regulatory developments***.
>
> Certain events might limit the ability of the Plan to transact at contract value with the issuers. Such events include (1) amendments to the Plan documents (including complete or partial Plan termination or merger with another

> plan), (2) changes to the Plan's prohibition on competing investment options or deletion of equity wash provisions, (3) bankruptcy of the Plan sponsor or other Plan sponsor events (for example, divestitures or spin-offs of a subsidiary) that cause a significant withdrawal from the Plan, (4) the failure of the trust to qualify for exemption from federal income taxes or any required prohibited transaction exemption under ERISA, or (5) premature termination of the contract. ***No events are probable of occurring that might limit the ability of the Plan to transact at contract value with the contract issuers and that also would limit the ability of the Plan to transact at contract value with the participants***.

Auditor's Reports attached to the 2024 Form 5500 for the 403(b) Plan, at 11-12 and the 401(a) Plan, at 12-13 (emphasis added).

82. Benefit responsive means that the participants can initiate transactions, such as withdrawals, at book value without adjustment.

83. For the above reasons, the Prisma Stable Value Fund's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive; (2) whose contracts are with creditworthy insurance carriers; and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date. The Prisma Stable Value Fund's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Prisma Stable Value Fund, therein making stated risk considerations equivalent.

84. As discussed below, Defendants' selection of the imprudent Prisma Stable Value Fund was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### B. Defendants Failed ERISA's High Standards Regarding Process and Methodology for Evaluating the Prisma Stable Value Fund

85. As described in the "Parties" section above, Defendants were fiduciaries of the Plans.

86. ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

87. As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

88. The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[8]

89. Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a retirement plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central

[8] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

90. Reasonable prudent monitoring of stable value funds like GICs requires fiduciaries to evaluate the terms and conditions of the GIC contracts, research the relevant market, and test the market by, among other things, issuing requests for information and proposals from competing GIC providers.

91. In the case of stable value options, there is not one commonly accepted and publicly available index in which to compare GICs. In fact, the IPS for the 403(b) Plan lists no benchmark for the Prisma Stable Value Fund. Instead, the IPS simply states: "If stable value or other stable principal investment options are utilized, the Committee may consider the following in its selection and monitoring process:

- Financial ratings of the issuer and/or insurance wrap provider(s)
- Composition of the underlying portfolio, including security type, duration, credit quality, and additional statistics as available
- History of portfolio crediting rates and/or performance
- Changes in company and/or management structure
- Plan level liquidity provisions"

IPS at 81.

92. Accordingly, the measurement of stable value funds, and specifically the Prisma Stable Value Fund, against prudently managed alternative stable value funds is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

93. Indeed, "peer comparison is one of the most widely used and accepted methods of equity analysis used by professional analysts, individual investors, and professionals."[9]

94. Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

95. It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options.").

96. It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

97. To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

98. Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plans, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plans' investments and fees because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a

[9] *See* https://www.investopedia.com/terms/p/peer-group.asp (last visited Jan. 29, 2026).

claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.”).

99. In fact, in an attempt to discover the details of the Plans’ mismanagement, Plaintiffs first wrote to the 403(b) Plan administrator on October 22, 2025 to request, among other things, “all written instruments” governing or pertaining to the Plan, including “Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]” “Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto,” and as well as any committee’s meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

100. By letter dated November 21, 2025, the 403(b) Plan’s administrator responded to Plaintiffs’ request. No meeting minutes, to the extent they exist, were produced in response to Plaintiffs’ request. Nor was the investment management contract for the Prisma Stable Value Fund provided.

101. Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary’s monitoring process. But in most cases, even that is not sufficient. For, “[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask ‘whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,’ not merely whether there were any methods whatsoever.” *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

102. Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Prudential GIF in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

103. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

104. In particular, Defendants failed to (1) consider the undue riskiness of the Prisma Stable Value Fund, and (2) failed to prudently monitor the Prisma Stable Value Fund, by among other things, determining readily available alternative stable value funds to replace the imprudent Prisma Stable Value Fund.

105. Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Prisma Stable Value Fund in the Plans throughout the Class Period that wasted the assets of the Plans and the assets of participants because of unnecessary costs and underperformance.

### C. Defendants Failed to Consider the Undue Riskiness of the Prisma Stable Value Fund

106. "When evaluating a traditional GIC, the most important consideration for the fiduciary- along with the contract terms- is the insurer's financial strength rating since an insurer's general account backs the guarantee that is at the core of this product."[10]

#### 1. Prudential/Empower Pose A Severe Risk Of Becoming Insolvent

##### a. The Securities and Exchange Commission Has Warned that Ratings from Credit Rating Agencies Are Unreliable

[10] https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

107. Because a guaranteed insurance account product – like the Prisma Stable Value Fund - is backed by the full faith and credit of the insurer, a focus must be placed on the creditworthiness of the insurer. It used to be the belief that an insurer's financial strength could be determined in part from its ratings from the four major rating agencies. This is no longer the case.

108. A June 7, 2023 Securities and Exchange Commission statement declared that ratings issued by ratings agencies are not reliable. It said these agencies shared blame for the 2008 financial crises:

> These entities' ratings were key to the marketing and sales of mortgage-backed securities, relied on by investors to make informed investment decisions — flaws and conflicts of interest notwithstanding. In some instances, Federal regulations required the use of credit ratings. As the 2011 report noted, the markets' — and, at times the federal government's — reliance on credit ratings that turned out to be highly misleading had consequences that reverberated "throughout the financial system." And not in a good way. …The Commission is replacing the references to credit ratings in Rules 101 and 102 of Regulation M with an alternative standard of creditworthiness that relies on credit risk models.

*See* https://www.sec.gov/newsroom/speeches-statements/lizarraga-statement-credit-ratings-060723

109. The SEC's reference to reliable credit risk models is instructive. It is widely recognized that the two greatest risks faced by for-profit life insurance and annuity ("L&A") carriers are: (1) Higher Risk, Offshore Reinsurance and (2) Higher-Risk, Less-Liquid and Investment Concentrations. *See generally*, September 13, 2022 Letter Submitted by Thomas D. Gober, Insurance and Reinsurance Fraud Expert, to The Hon. Sherrod C. Brown, Chairman

Committee on Banking, Housing, and Urban Affairs, at p. 57-68 (available at https://www.congress.gov/117/chrg/CHRG-117shrg53607/CHRG-117shrg53607.pdf)[11]

110. These two higher-risk categories should always be compared against the L&A carrier's surplus, not total assets. This credit risk model enables the reader (or Plan fiduciary) to better assess the degree to which those higher risks can be a real threat to the long-term viability of the L&A carrier.

**b. Based on its Insufficient Surplus, Prudential/Empower Was/Is at Severe Risk of Insolvency**

111. Available surplus is the most relevant criteria for measuring insurance company credit worthiness for a number of reasons, the most pertinent of which is that surplus is the only buffer between a viable insurer and an insolvent one. In other words, if an asset must be written down, the total write-down comes out of surplus. That is why it is imprudent to have a thin surplus buffer relative to the carrier's risk profile.

112. An important surplus adequacy benchmark ratio is the Surplus to Liabilities (S/L) Ratio. The higher the ratio, the better. The national average for the L&A industry is roughly 7.5%. That average of 7.5% is significantly pulled down by some of the larger, aggressive private equity-controlled carriers with much lower ratios. During the Class Period, Empower (and before it, Prudential), had an alarmingly low S/L ratio. For example, as of 2024, Empower's S/L ratio was less than 1%:

[11] The letter to The Hon. Sherrod C. Brown is found within "Current Issues in Insurance, Hearing Before the Committee on Banking, Housing, and Urban Affairs United States Senate, September 8, 2022, available at https://www.govinfo.gov/

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company

**LIABILITIES, SURPLUS AND OTHER FUNDS**

| | | 1 Current Year | 2 Prior Year |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 106,414,669,390 | 91,068,627,605 |
| 29. | Common capital stock | 2,500,000 | 2,500,000 |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | 0 | 0 |
| 32. | Surplus notes | 0 | |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | 943,498,537 | 943,498,537 |
| 34. | Aggregate write-ins for special surplus funds | 42,704,077 | 15,222,689 |
| 35. | Unassigned funds (surplus) | 29,697,164 | (24,056,237) |
| 36. | Less treasury stock, at cost: | | |
| | 36.1 ............ shares common (value included in Line 29 $ ............ ) | | |
| | 36.2 ............ shares preferred (value included in Line 30 $ ............ ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ ............ in Separate Accounts Statement) | 1,015,899,778 | 934,664,989 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 1,018,399,778 | 937,164,989 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 107,433,069,168 | 92,005,792,594 |

| | | | |
|---|---|---|---|
| Total Surplus: | $ | 1,018,399,778 | EAIC's 2024 Surplus to Liabilities |
| Total Liabilities: | $ | 106,414,669,390 | Ratio is Less Than 1%. The |
| **Surplus to Liabs Ratio:** | | **0.96%** | National Average is About **7.5%**. |

113. There are numerous L&A carriers that have substantially higher S/L ratios than Empower. For example, New York Life, at December 31, 2024, had (see below) $26.43 billion in surplus and $218.5 billion in liabilities. That yields a S/L ratio of 12.1%:

| | | | |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 218,473,153,964 | 206,607,540,338 |
| 29. | Common capital stock | | |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | | |
| 32. | Surplus notes | 4,233,167,821 | 4,232,366,504 |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | | |
| 34. | Aggregate write-ins for special surplus funds | 803,673,430 | 434,820,194 |
| 35. | Unassigned funds (surplus) | 21,390,599,996 | 20,626,889,733 |
| 36. | Less treasury stock, at cost: | | |
| | 36.1 ............ shares common (value included in Line 29 $ ............ ) | | |
| | 36.2 ............ shares preferred (value included in Line 30 $ ............ ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ ............ in Separate Accounts Statement) | 26,427,441,247 | 25,294,076,431 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 26,427,441,247 | 25,294,076,431 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 244,900,595,211 | 231,901,616,769 |

| | | | |
|---|---|---|---|
| Total Surplus: | $ | 26,427,441,247 | EAIC's 2024 Surplus to Liabilities |
| Total Liabilities: | $ | 218,473,153,964 | Ratio is Less Than 1%. The |
| **Surplus to Liabs Ratio:** | | **12.10%** | National Average is About **7.5%**. |

### c. Prudential/Empower Is/Was Rendered Vulnerable Because of its Higher Risk, Offshore Reinsurance Compared to its Surplus

114. Specific to this matter, Empower entered into several significant reinsurance transactions with one offshore reinsurer. First, Empower ceded (Schedule S – Part 3 shown below) **$2.64 billion in Reserve Credit** (column 9) to Hannover Life Reassurance Company of America

(Bermuda) Ltd (HLRCA Bermuda). The "reserve credit" means that Empower has *deducted* that $2.64 billion from its liabilities because the reinsurer has reportedly *set up* that amount in liabilities on their end. As an offshore reinsurer, HLRCA Bermuda does not report to US regulators under US SAP (Statutory Accounting Principles). This lack of transparency is significant and makes it difficult, most often impossible, to determine how the reinsurer is accounting for the transaction on their end.

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity In

**SCHEDULE S - PART 3 - SECTION**

Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities Without Life or Disability Contingencies, and Related Ber

| 1<br>NAIC Company Code | 2<br>ID Number | 3<br>Effective Date | 4<br>Name of Company | 5<br>Domi-ciliary Juris-diction | 6<br>Type of Reinsurance Ceded | 7<br>Type of Business Ceded | 8<br>Amount in Force at End of Year | Reserve Cr<br>9<br>Current Year |
|---|---|---|---|---|---|---|---|---|
| 0399999. Total General Account - Authorized U.S. Affiliates | | | | | | | 0 | 0 |
| 0699999. Total General Account - Authorized Non-U.S. Affiliates | | | | | | | 0 | 0 |
| 0799999. Total General Account - Authorized Affiliates | | | | | | | 0 | 0 |
| 65676 | 35-0472300 | 01/01/1998 | Lincoln National Life Insurance Company | IN | CO/I | VA | 0 | 0 |
| 66869 | 31-4156830 | 12/31/2023 | Nationwide Insurance | OH | CO/G | FA | 0 | 161,418 |
| 0899999. General Account - Authorized U.S. Non-Affiliates | | | | | | | 0 | 161,418 |
| 1099999. Total General Account - Authorized Non-Affiliates | | | | | | | 0 | 161,418 |
| 1199999. Total General Account Authorized | | | | | | | 0 | 161,418 |
| 1499999. Total General Account - Unauthorized U.S. Affiliates | | | | | | | 0 | 0 |
| 1799999. Total General Account - Unauthorized Non-U.S. Affiliates | | | | | | | 0 | 0 |
| 1899999. Total General Account - Unauthorized Affiliates | | | | | | | 0 | 0 |
| 2199999. Total General Account - Unauthorized Non-Affiliates | | | | | | | 0 | 0 |
| 2299999. Total General Account Unauthorized | | | | | | | 0 | 0 |
| 2599999. Total General Account - Certified U.S. Affiliates | | | | | | | 0 | 0 |
| 2899999. Total General Account - Certified Non-U.S. Affiliates | | | | | | | 0 | 0 |
| 2999999. Total General Account - Certified Affiliates | | | | | | | 0 | 0 |
| 00000 | AA-3191255 | 12/31/2022 | Hannover Life Reassur Co. of Amer (Bermuda) LTD | BMU | COFW/G | FA | 0 | 2,638,835,092 |

115. Separate and in addition to the reserve credit reported above, Empower has also entered into a Modified Coinsurance (ModCo) reinsurance contract with HLRCA Bermuda. Note below, in column 14, that ModCo reinsurance balance was **$25.4 billion**:

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company

**SCHEDULE S - PART 3 - SECTION 1**

Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities Without Life or Disability Contingencies, and Related Benefits Listed by Reinsuring Company as of December 31, Current Year

| 1<br>NAIC Company Code | 2<br>ID Number | 3<br>Effective Date | 4<br>Name of Company | 5<br>Domi-ciliary Juris-diction | 6<br>Type of Reinsurance Ceded | 7<br>Type of Business Ceded | 8<br>Amount in Force at End of Year | Reserve Credit Taken<br>9<br>Current Year | Reserve Credit Taken<br>10<br>Prior Year | 11<br>Premiums | Outstanding Surplus Relief<br>12<br>Current Year | Outstanding Surplus Relief<br>13<br>Prior Year | 14<br>Modified Coinsurance Reserve |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00000 | AA-3191255 | 12/31/2022 | Hannover Life Reassur Co. of Amer (Bermuda) LTD | BMU | MCOFW/G | VA | 0 | 0 | 0 | 0 | 0 | 0 | 25,384,625,880 |

116. The total reported balance of **both offshore contracts is $28 billion**. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:




117. The end result of the above maneuvering is that Empower made it appear it had many billions less liabilities than it really had by purportedly off-loading its liabilities to a reinsurer. There is no way to confirm the reinsurer's viability because the reinsurer is off-shore and does not report under statutory accounting in the United States.[12]

118. Moreover, because HLRCA Bermuda does not report in the US in compliance with US statutes, under US SAP, it can't be determined what the "substance" of the transactions are and if HLRCA Bermuda has properly reserved for them. In fact, most technical industry media and numerous federal agencies have warned that the concern with offshore reinsurance, in addition

---

[12] *See* "Moody's Waves Yellow Flag as Worries Mount About Reinsurance Deals," by Warren S. Hersch, June 5, 2023 (quoting Moody's Investors Service as stating off-shore reinsurer "business provides less transparency for investors and is generally subject to less regulation than business that resides onshore in U.S.-regulated entity" *See also* "FSOC raises alarm on insurers' use of offshore reinsurance," by Kenneth Araullo, May 10, 2025 (stating "The US Financial Stability Oversight Council (FSOC) has raised concerns about the financial stability of life insurers, citing increasingly complex investment strategies and a growing reliance on offshore reinsurers with less stringent capital requirements."), available at https://www.insurancebusinessmag.com/reinsurance/news/breaking-news/fsoc-raises-alam-on-insuers-use-of-offshore-reinsurance-527931.aspx.

to the lack of transparency, is that a primary motive for going offshore is "regulatory arbitrage,"[13] meaning that the regulatory regime offshore allows less stringent reserving for liabilities, lower capital requirements and less asset quality restrictions. *See* n. 17.

**d. Prudential/Empower Is/Was rendered Vulnerable Because of its Higher Risk, Less-Liquid Investment Concentrations**

119. Empower has a variety of higher-risk assets in significant concentrations relative to its surplus. At December 31, 2024, Empower reported a total of $4.3 billion in higher-risk, less traditional investments that are *not* reported under Long-Term Bonds. These include $3.75 billion in commercial mortgage loans and $552 million in "Other" invested assets and Derivatives, of which $236.5 million are notably affiliated. Under the Long-Term Bonds category, Empower reports another $3.8 billion in higher-risk, less liquid bond categories, including Residential Mortgage-Backed Securities (MBS), Commercial MBS, "Other Loan-Backed and Structured Securities."

120. The combined total of the above-described investments is $8.1 billion. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:

[13] "Regulatory arbitrage is a practice whereby firms capitalize on loopholes in regulatory systems in order to circumvent unfavorable regulations. Arbitrage opportunities may be accomplished by a variety of tactics, including restructuring transactions, financial engineering and geographic relocation to amenable jurisdictions." Investopedia, found at https://www.investopedia.com/terms/r/regulatory-arbitrage.asp

EAIC Higher-Risk, Less-Liquid Asset Concentrations vs Surplus
At December 31, 2024
**[All data in Billions]**

| H-R Assets | Surplus |
|---|---|
| $ 8.10 | $ 1.02 |




121. Again, the inadequate surplus compared to the investment concentrations puts Empower in dire risk of insolvency, especially in light of the widely reported investment liquidity and valuation stresses today.

***

122. In short, Empower/Prudential's lack of adequate surplus compared to its true liabilities during the Class Period has put Empower/Prudential squarely at risk of insolvency thereby making any "guaranteed" investment contract not worth the paper it is written on.

### D. The Prisma Stable Value Fund Materially Underperformed Relative to Comparator Stable Value Fund GICs Since Before the Start of the Class Period

123. The Prisma Stable Value Fund is imprudent for other reasons. Selecting and monitoring stable value products requires researching the relevant market, and testing the market

by, among other things, issuing requests for proposals to solicit bid proposals. That is because stable value products are substantially similar in that their stated goal is to preserve income.

124. Accordingly, it is a best practice for plans with substantial participant investments in stable value products to solicit competitive bids to initially select a stable value product, monitor opportunities in the entire marketplace on an ongoing basis, and periodically solicit competitive bids.

125. The Plans' fiduciaries took no such steps. Had Defendants continually monitored and evaluated the Prisma Stable Value Fund's rates, they would have known, if they did not actually know, that the investment underperformed year after year since before the start of the Class Period and for the entire Class Period compared to other comparable stable value funds.

126. If Defendants had adopted and implemented a prudent process or policy, they could easily have selected or switched to another stable value fund with a proven track record of competitive returns.

127. The terms of the Prisma Stable Value Fund allow for this action. The Prisma Stable Value Fund provides a guaranteed interest rate that is announced in advance and is guaranteed for a six-month period.[14] So at a minimum, every six months during the Class Period, Defendants had an opportunity to rectify their imprudent conduct and select another GIC with higher crediting rates. Moreover, the terms of the Prisma Stable Value Fund contract allowed Plans participants to

[14] *See* Auditor's Reports, attached to 2024 Form 5500 for the 403(b) Plan, at 11, and 2024 Form 5500 for the 401(a) Plan, at 14 ("The crediting rates are reviewed on a semi-annual basis for resetting at [Empower].").

withdraw their investments at full value[15] to invest elsewhere, like a prudent GIC alternative, if that choice had been made available to them by the Plans' fiduciaries.

128. As stated above, the Prisma Stable Value Fund's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) whose contracts are with creditworthy insurance carriers, and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date.

129. Additionally, the Prisma Stable Value Fund's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Prisma Stable Value Fund, therein making risk considerations equivalent.

130. And finally, comparisons to other stable value funds is appropriate because stable value funds share similar investment strategies.

131. The Comparator Funds below meet these requirements. Importantly, the Prisma Stable Value Fund had chronically underperforming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans.

132. Defendants' selection of the imprudent Prisma Stable Value Fund was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

**1. There are Many GICs in the Marketplace with Competitive Crediting Rates**

[15] *See* Auditor's Reports, attached to 2024 Form 5500 for the 403(b) Plan, at 12, and 2024 Form 5500 for the 401(a) Plan, at 14 ("Participants may ordinarily direct the withdrawal or transfer of all or a portion of their investment at contract value.").

133. The Prisma Stable Value Fund in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans.

134. The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

135. Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plans, but were not selected by Defendants.

136. As representative examples, these comparisons include:

- Auto-Owners Life Insurance Company ("AOLIC") provided a "fully benefit-responsive investment contract" for the Auto-Owners Insurance Company Retirement Savings Plan. Auditor's Report, attached to 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at 9. Further, like the Prisma Stable Value Fund, "[t]he plan administrator does not believe that the occurrence of and such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id.*, at 10. Finally, "[t]he guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id.*

- The Ameritas 401(k) Retirement Plan offered a "fully benefit-responsive" unallocated insurance contract with Ameritas Life Insurance Corp. Auditor's Report attached to the 2024 Form 5500 for the Ameritas 401(k) Retirement Plan, at 10. "Interest rate guarantees of the unallocated insurance contract are backed by assets held by the Company." *Id.* Like the Prisma Stable Value Fund, "[u]nder no event may the Company terminate this contract and settle at an amount different from contract value." *Id.*

- The Standard 401(k) Plan offered "a fully benefit-responsive investment contract ("FBRIC") with Standard [Insurance Company]." Auditor's Report attached to 2024 Form 5500 for The Standard 401(k) Plan. "The Plan's ability to receive amounts due is dependent on the issuer's ability to meet its financial obligations." *Id*. Like the Prisma Stable Value Fund, "The FBRIC does not permit the insurance company to terminate the agreements prior to the scheduled maturity date" and "[n]o events are probable of occurring that might limit the Plan's ability to transact

at contract value with the contract issuer and that also would limit the ability of the Plan to transact at contract value with the participants." *Id*.

- The Ford Foundation Retirement Plan offered "a guaranteed fixed annuity contract" that was "fully and unconditionally guaranteed by TIAA." Auditor's Report, attached to 2024 Form 5500 for the Ford Foundation Retirement Plan, at 11. "The participant's principal, plus a specified minimum rate of interest, are guaranteed by TIAA's claims-paying ability." *Id*., at 12.

- The Transamerica 401(k) Retirement Savings Plan offered "a fully benefit-responsive GIC with TFLIC, where TFLIC maintains the contributions in a general account." Auditor's Report, attached to 2024 Form 5500 for the Transamerica 401(k) Retirement Savings Plan, at 8. "The GIC issuer contractually must repay the principal and a specified interest rate that the issuer guarantees to the Plan." *Id*. Like the Prisma Stable Value Fund, "[t]he Company does not believe that the occurrence of any such events that would limit the Plan's ability to transact at contract value with participants is probable." *Id*., at 9.

137. Collectively, the GICs in the Auto-Owners Insurance Company Retirement Savings Plan, the Ameritas 401(k) Retirement Plan, The Standard 401(k) Plan, the Ford Foundation Retirement Plan, and the Transamerica 401(k) Retirement Savings Plan are referred to as the "Comparator Funds."

138. The Prisma Stable Value Fund's consistent underperformance was detrimental to Plan participants. Because of the compounding losses or gains of investments, prudent fiduciaries will compare relative performance of comparable investments, rather than just absolute performance. This is because even a "1%" difference causes exponential losses beyond what occurs "each year" because of the "lost investment opportunity" that a better performing fund "would have earned over time." *Tibble II*, 843 F.3d at 1198.

139. Because of the compounding losses or gains of investments, prudent fiduciaries will compare relative performance of comparable investments, rather than just absolute performance. This is because even a "1%" difference causes exponential losses beyond what

occurs "each year" because of the "lost investment opportunity" that a better performing fund "would have earned over time." *Tibble II*, 843 F.3d at 1198.

**2. The Prisma Stable Value Fund performed poorly when compared to the Comparator Funds Since Before the Start of the Class Period**

**a. The Comparator Funds Outperformed the Prisma Stable Value Fund in 2018**

140. Underscoring the futility of the Prisma Stable Value Fund is the fact that for years leading up to the Class Period, its investment performance languished compared to the Comparator Funds.

141. Prior to the start of the Class Period in March 2020, the poor investment performance of the Prisma Stable Value Fund tells a tale of fiduciaries asleep at the wheel, failing to replace a clearly imprudent fund. The continued offering of the Prisma Stable Value Fund through such underperformance evidences a lack of prudent monitoring of the Prisma Stable Value Fund by Defendants, including circumstantial evidence Defendants failed to conduct a market-wide search for a prudent alternative.

142. As demonstrated in the table below, the Prisma Stable Value Fund performed poorly against the comparator funds in 2018.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[16] |
|---|---|---|---|---|---|
| 2018 | Auto-Owners Insurance Company Retirement Savings Plan | 6,192 | $430,631,009 | Auto-Owners Insurance Company | N/A |
| | Ameritas 401(k) Retirement Plan | 3,563 | $536,284,791 | Ameritas Life Insurance | 3.53% |

[16] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | | | | | |
|---|---|---|---|---|---|
| | The Standard 401(k) Plan | 4,614 | $648,650,023 | Standard Insurance | 3.31% |
| | Ford Foundation Retirement Plan | 170 | $252,222,046 | TIAA-CREF | 4.26% |
| | Transamerica 401(k) Retirement Savings Plan | 15,719 | $1,739,573,028 | Transamerica Financial Life | 3.93% |
| | **Prisma Health 403(b) Plan** | **17,968** | **$801,115,118** | **Prudential** | **2.21%** |
| | **Prisma Health 401(a) Plan** | **15,926** | **$425,278,226** | **Prudential** | **2.23%** |

143. In 2018, the Prisma Stable Value Fund in the 403(b) Plan underperformed the Comparator Funds by 41.18% and the Prisma Stable Value Fund in the 401(a) Plan underperformed the Comparator Funds by 40.65%.

**b. The Prisma Stable Value Fund's Poor Performance Continued through 2019**

144. As demonstrated in the table below, the Prisma Stable Value Fund's poor performance continued through 2019.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2019 | Auto-Owners Insurance Company Retirement Savings Plan | 6,971 | $534,060,576 | Auto-Owners Insurance Company | 3.11% |
| | Ameritas 401(k) Retirement Plan | 3,600 | $629,709,023 | Ameritas Life Insurance | 3.64% |
| | The Standard 401(k) Plan | 4,476 | $784,864,962 | Standard Insurance | 3.69% |
| | Ford Foundation Retirement Plan | 227 | $273,116,729 | TIAA-CREF | 4.08% |

| | | | | | |
|---|---|---|---|---|---|
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life | 3.85% |
| | **Prisma Health 403(b) Plan** | **18,238** | **$1,346,822,105** | **Prudential** | **0.47%** |
| | **Prisma Health 401(a) Plan** | **17,867** | **$717,398,899** | **Prudential** | **0.44%** |

145. In 2019, the Prisma Stable Value Fund in the 403(b) Plan underperformed the Comparator Funds by 87.21% and the Prisma Stable Value Fund in the 401(a) Plan underperformed the Comparator Funds by 88.02%.

146. From 2018 through 2019, The Prisma Stable Value Fund underperformed the Comparator Funds by an average of over 64% in both the 403(b) Plan and the 401(a) Plan, as demonstrated in the table below.

| **Year** | **Prisma Stable Value Fund Rate of Return in the 403(B) Plan** | **Prisma Stable Value Fund Rate of Return in the 401(a) Plan** | **Comparator Funds Average Rate of Return** | **Prisma Stable Value Fund Percentage of Under-performance in the 403(b) Plan** | **Prisma Stable Value Fund Percentage of Under-performance in the 401(a) Plan** |
|---|---|---|---|---|---|
| 2018 | 2.21% | 2.23% | 3.76% | 41.18% | 40.65% |
| 2019 | 0.47% | 0.44% | 3.67% | 87.21% | 88.02% |
| Avg | 1.34% | 1.34% | 3.72% | | |
| **Average Underperformance (2018-2019)** | | | | **64.20%** | **64.34%** |

**3. The Prisma Stable Value Fund Continued to perform poorly when compared to the Comparator Funds Since the Start of the Class Period**

**a. The Comparator Funds Outperformed the Prisma Stable Value Fund in 2020**

147. By the start of the Class Period, it was still the same story, with the Prisma Stable Value Fund continuing to underperform the Comparator Funds.

148. In 2020, the Comparator Funds performed much better than the Prisma Stable Value Fund. Specifically, the Comparator Funds had an average calculated crediting rate of 3.57%. The calculated crediting rate for the Prisma Stable Value Fund in the 403(b) Plan was 2.39% in 2020, and the calculated crediting rate for the Prisma Stable Value Fund was 2.59% in 2020.

149. The table below demonstrates the underperformance of the Prisma Stable Value Fund compared to the Comparator Funds.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[17] |
|---|---|---|---|---|---|
| 2020 | Auto-Owners Insurance Company Retirement Savings Plan | 7,192 | $620,678,961 | Auto-Owners Insurance Company | 3.07% |
| | Ameritas 401(k) Retirement Plan | 3,553 | $708,127,755 | Ameritas Life Insurance | 3.48% |
| | The Standard 401(k) Plan | 4,554 | $920,504,787 | Standard Insurance | 3.23% |
| | Ford Foundation Retirement Plan | 228 | $292,861,235 | TIAA-CREF | 4.04% |
| | Transamerica 401(k) Retirement Savings Plan | 14,722 | $2,347,162,318 | Transamerica Financial Life | 3.27% |
| | **Prisma Health 403(b) Plan** | **34,630** | **$1,548,561,638** | **Prudential** | **2.39%** |
| | **Prisma Health 401(a) Plan** | **28,390** | **$766,185,554** | **Prudential** | **2.59%** |

[17] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

150. In 2020, the Prisma Stable Value Fund in the 403(b) Plan underperformed the Comparator Funds by 30.08% and the Prisma Stable Value Fund in the 401(a) Plan underperformed the Comparator Funds by 24.22%.

151. Additionally, the Prisma Stable Value Fund underperformed other GICs with similar characteristics as the Prisma Stable Value Fund in 2020, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | Alina 401(k) Retirement Savings Plan | 32,203 | $2,690,046,457 | Brighthouse Life Insurance Company | 3.72% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Prisma Health 403(b) Plan** | **34,630** | **$1,548,561,638** | **Prudential** | **2.39%** |
| | **Prisma Health 401(a) Plan** | **28,390** | **$766,185,554** | **Prudential** | **2.59%** |

### b. The Prisma Stable Value Fund's Poor Performance Continued through 2021

152. As demonstrated in the table below, the Prisma Stable Value Fund's poor performance continued through 2021.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Auto-Owners Insurance Company Retirement Savings Plan | 7,480 | $711,146,156 | Auto-Owners Insurance Company | 3.02% |
| | Ameritas 401(k) Retirement Plan | 3,537 | $779,870,323 | Ameritas Life Insurance | 3.43% |
| | The Standard 401(k) Plan | 4,674 | $1,062,535,266 | Standard Insurance | 3.29% |
| | Ford Foundation Retirement Plan | 198 | $309,155,677 | TIAA-CREF | 3.56% |
| | Transamerica 401(k) Retirement Savings Plan | 14,065 | $2,563,127,214 | Transamerica Financial Life | 3.32% |
| | **Prisma Health 403(b) Plan** | **33,628** | **$1,786,109,962** | **Prudential** | **1.76%** |
| | **Prisma Health 401(a) Plan** | **30,023** | **$857,595,059** | **Prudential** | **1.82%** |

153. In 2021, the Prisma Stable Value Fund in the 403(b) Plan underperformed the Comparator Funds by 47.05% and the Prisma Stable Value Fund in the 401(a) Plan underperformed the Comparator Funds by 45.25%.

154. Additionally, the Prisma Stable Value Fund underperformed other GICs with similar characteristics as the Prisma Stable Value Fund in 2021, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |

| | | | | | |
|---|---|---|---|---|---|
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Prisma Health 403(b) Plan** | **33,628** | **$1,786,109,962** | **Prudential** | **1.76%** |
| | **Prisma Health 401(a) Plan** | **30,023** | **$857,595,059** | **Prudential** | **1.82%** |

**c. The Comparator Funds Outperformed the Prisma Stable Value Fund in 2022**

155. As demonstrated in the table below, the Prisma Stable Value Fund's poor performance continued through 2022.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | Auto-Owners Insurance Company Retirement Savings Plan | 8,251 | $672,249,956 | Auto-Owners Insurance Company | 3.08% |
| | Ameritas 401(k) Retirement Plan | 3,779 | $636,210,578 | Ameritas Life Insurance | 3.30% |
| | The Standard 401(k) Plan | 4,832 | $931,024,946 | Standard Insurance | 3.22% |

| | | | | | |
|---|---|---|---|---|---|
| | Ford Foundation Retirement Plan | 174 | $261,575,612 | TIAA-CREF | 4.21% |
| | Transamerica 401(k) Retirement Savings Plan | 14,280 | $2,116,061,137 | Transamerica Financial Life | 3.23% |
| | **Prisma Health 403(b) Plan** | **35,311** | **$1,580,787,343** | **Prudential** | **1.77%** |
| | **Prisma Health 401(a) Plan** | **26,260** | **$722,418,332** | **Prudential** | **1.81%** |

156. In 2022, the Prisma Stable Value Fund in the 403(b) Plan underperformed the Comparator Funds by 48.06% and the Prisma Stable Value Fund in the 401(a) Plan underperformed the Comparator Funds by 46.89%.

157. Additionally, the Prisma Stable Value Fund underperformed other GICs with similar characteristics as the Prisma Stable Value Fund in 2022, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |

| | | | | | |
|---|---|---|---|---|---|
| | Alina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **Prisma Health 403(b) Plan** | **35,311** | **$1,580,787,343** | **Prudential** | **1.77%** |
| | **Prisma Health 401(a) Plan** | **26,260** | **$722,418,332** | **Prudential** | **1.81%** |

**d. The Prisma Stable Value Fund's Poor Performance Continued through 2023**

158. As demonstrated in the table below, the Prisma Stable Value Fund's poor performance continued through 2023.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Insurance Company | 3.48% |
| | Ameritas 401(k) Retirement Plan | 3,686 | $741,588,807 | Ameritas Life Insurance | 3.66% |
| | The Standard 401(k) Plan | 5,371 | $1,129,069,194 | Standard Insurance | 3.64% |
| | Ford Foundation Retirement Plan | 126 | $287,214,199 | TIAA-CREF | 4.76% |
| | Transamerica 401(k) Retirement Savings Plan | 14,168 | $2,425,600,114 | Transamerica Financial Life | 3.79% |

| | | | | | |
|---|---|---|---|---|---|
| | **Prisma Health 403(b) Plan** | **38,628** | **$1,879,344,092** | **Empower** | **0.46%** |
| | **Prisma Health 401(a) Plan** | **32,021** | **$837,923,618** | **Empower** | **0.52%** |

159. In 2023, the Prisma Stable Value Fund in the 403(b) Plan underperformed the Comparator Funds by 88.10% and the Prisma Stable Value Fund in the 401(a) Plan underperformed the Comparator Funds by 86.55%.

160. Additionally, the Prisma Stable Value Fund underperformed other GICs with similar characteristics as the Prisma Stable Value Fund in 2023, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **Prisma Health 403(b) Plan** | **38,628** | **$1,879,344,092** | **Empower** | **0.46%** |
| | **Prisma Health 401(a) Plan** | **32,021** | **$837,923,618** | **Empower** | **0.52%** |

**e. The Comparator Funds Outperformed the Prisma Stable Value Fund in 2024**

161. In 2024, the Comparator Funds outperformed the Prisma Stable Value Fund.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2024 | Auto-Owners Insurance Company Retirement Savings Plan | 8,950 | $864,332,421 | Auto-Owners Insurance Company | 3.40% |
| | Ameritas 401(k) Retirement Plan | 3,632 | $821,792,248 | Ameritas Life Insurance | 3.91% |
| | The Standard 401(k) Plan | 5,845 | $1,332,816,995 | Standard Insurance | 4.01% |
| | Ford Foundation Retirement Plan | 90 | $298,370,091 | TIAA-CREF | 4.59% |
| | Transamerica 401(k) Retirement Savings Plan | 13,910 | $2,720,479,704 | Transamerica Financial Life | 3.86% |
| | **Prisma Health 403(b) Plan** | **38,970** | **$2,165,121,786** | **Empower** | **3.94%** |
| | **Prisma Health 401(a) Plan** | **28,336** | **$938,584,818** | **Empower** | **3.86%** |

162. In 2024, the Prisma Stable Value Fund in the 403(b) Plan underperformed the Comparator Funds by 0.35% and the Prisma Stable Value Fund in the 401(a) Plan underperformed the Comparator Funds by 2.38%.

163. Additionally, the Prisma Stable Value Fund underperformed other GICs with similar characteristics as the Prisma Stable Value Fund in 2024, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| | Martignetti Companies, LLC 401(k) Plan | 1,160 | $240,540,763 | Massachusetts Mutual Life Ins. Co. | 4.35% |
| | Northeast Medical Services Profit Sharing 401(k) Plan | 1,467 | $174,979,442 | New York Life Ins. Co. | 4.58% |
| | **Prisma Health 403(b) Plan** | **38,970** | **$2,165,121,786** | **Empower** | **3.94%** |
| | **Prisma Health 401(a) Plan** | **28,336** | **$938,584,818** | **Empower** | **3.86%** |

164. Throughout the Class Period, the Prisma Stable Value Fund underperformed the Comparator Funds by an average of over 42% in the 403(b) Plan and by an average of over 41% in the 401(a) Plan as demonstrated in the table below.

| Year | Prisma Stable Value Fund Rate of Return in the 403(B) Plan | Prisma Stable Value Fund Rate of Return in the 401(a) Plan | Comparator Funds Average Rate of Return | Prisma Stable Value Fund Percentage of Under-performance in the 403(b) Plan | Prisma Stable Value Fund Percentage of Under-performance in the 401(a) Plan |
|---|---|---|---|---|---|
| 2020 | 2.39% | 2.59% | 3.42% | 30.08% | 24.22% |
| 2021 | 1.76% | 1.82% | 3.32% | 47.05% | 45.25% |
| 2022 | 1.77% | 1.81% | 3.41% | 48.06% | 46.89% |
| 2023 | 0.46% | 0.52% | 3.87% | 88.10% | 86.55% |
| 2024 | 3.94% | 3.86% | 3.95% | 0.35% | 2.38% |
| Avg | 2.06% | 2.12% | 3.59% | | |
| **Average Underperformance during Class Period** | | | | **42.73%** | **41.06%** |

165. The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the Prisma Stable Value Fund's dismal crediting rate.

166. Again, the specific Comparator Funds used herein had similar risk considerations based on its terms and the creditworthiness of its insurance carriers. The Comparator Funds were fully benefit-responsive and their crediting rates were regularly reviewed in the same prevailing marketplace and economic circumstances as the Prisma Stable Value Fund.

167. In short, because the Plans held over $2 billion combined in assets under management throughout the Class Period, they had considerable leverage to bargain for higher crediting rates.

168. A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates and/or by submitting requests for proposals to Prudential/Empower and other providers of stable value investments.

**4. The Prisma Stable Value Fund performed poorly when compared globally to all stable value funds**

169. There is one more noteworthy benchmark to consider. According to an article by the Stable Value Institute of America ("SVIA"), "[t[he Stable Value Investment Association recently examined 135,000 retirement savings plans serving approximately 42 million participants. From January 2010 through December 2019, stable value assets in [retirement] plans grew at a compound annual rate of 4.1%."[18]

[18] *See* "Retirement Plans and Stable Value: By the Numbers," updated July 21, 2025, available at https://www.stablevalue.org/retirement-plans-and-stable-value-by-the-numbers/ (last visited March 9, 2026)

170. Comparatively, as noted above, the Prisma Stable Value Fund from 2018 through 2019 had a 2.06% average return rate. The Comparator Funds had an average 3.72% return rate. Thus, compared to the national average return rate for stable value funds as determined by the SVIA, the Prisma Stable Value Fund underperformed while the Comparator Funds were near the average.

171. And then, from 2020 to 2024 the Comparator Funds had an average return of 3.59%. Thus, the average returns for the Comparator Funds for this time period is a relatively conservative return compared to the 4.1% returns observed by the SVIA. Yet, even while conservative, the Comparator Funds' average returns were higher than the Prudential GIF's average returns.

172. Specifically, from 2020 to 2024, the Prisma Stable Value Fund had an average return of 2.06% in the 403(b) Plan and 2.12% in the 401(a) Plan. This was over 51% less than the 4.1% returns the SVIA cited for 42 million participants.

* * *

173. By selecting the Prisma Stable Value Fund with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

174. With the significant amount of assets under management in the Prisma Stable Value Fund, comprising 11% to 17% of Plan assets from 2020 to 2024, the losses suffered by Plan participants were devastating, costing the Plans and the participants millions of dollars. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1%

higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[19]

175. In sum, the Prudential GIF in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar riskiness provided by other comparable carriers for other retirement plans.

176. Given the Plan's substantial stable value investment assets, reasonably prudent monitoring of the Prudential GIF required Defendants to evaluate the terms and conditions of the GIC contract, research the relevant market, and test the market by, among other things, issuing requests for information and proposals from competing stable value providers. All of which they failed to do.

### E. Defendants Violated Their Duties of Prudence and Loyalty by Choosing More Expensive Class A Shares of the Putnam, Clearbridge, and Western Funds

177. Before identifying examples of Defendants' imprudence in selecting costlier mutual fund share classes, this section provides background on the topic.

178. In administering a large ERISA plan, every prudent fiduciary understands that "[s]ome mutual funds offer investors different types of shares, known as 'classes.' Each class invests in the same portfolio of securities and has the same investment objectives and policies. But each class has different shareholder services and/or distribution arrangements, with different fees

[19] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed April 21, 2026).

and expenses. Because of the different fees and expenses, each class will likely have different performance results."[20]

179. At bottom, a mutual fund's share classes are simply slices of the same mutual fund pie, but some slices cost more than others. This is because large institutional investors, like the Prisma Health 401(a) and 403(b) Plans, are offered bulk discounts in the form of "institutional" share classes with lower per-unit costs.

180. "This means that owning a different class of the same fund will result in different investment returns. The effect of different fees on different mutual fund share classes is compounded over time. * * * The more fees you pay, the less money is invested in the mutual fund share class and the less you will earn – now and over time."[21]

181. Absent unusual circumstances—none of which are evident here—it is grossly imprudent for a fiduciary to select higher cost shares of a mutual fund when lower cost shares of the same fund are available. *See Tibble v. Edison Int'l*, No. 07-cv-5359, 2017 WL 3523737, at *12 (C.D. Cal. Aug. 16, 2017) ("[N]o prudent fiduciary would purposefully invest in higher cost retail shares . . . . [A] prudent fiduciary would have invested in the lower-cost institutional-class shares.").

182. Here, Prisma Health's investment menu steered Plaintiff and Class Members towards high cost, retail level Class A shares of various mutual funds, including the Clearbridge, Western, and Putnam Funds. Lowest-cost shares of each fund were available to the Plans, but

---

[20] https://www.investor.gov/introduction-investing/investing-basics/glossary/mutual-fund-classes.

[21] https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-61.

Defendants opted to weigh down its employees' retirement savings with the more expensive Class A shares.

183. This Complaint thus raises a "class share claim" against Defendants. "A 'retail class share' claim asserts that fiduciaries offered plan participants higher-cost retail-class investment options . . . when otherwise identical lower-cost institution-class products were available." Lauren K. Valastro, *How Misapplying Twombly Erodes Retirement Funds*, 32 Geo. Mason L. Rev. 421, 458–59 (2025). This form of "malfeasance" involves "the fiduciary needlessly elect[ing] to pay more for the same product when a lower bulk price was available." *Id*. By analogy, "it would be difficult to assert that a consumer with sufficient funds to buy either a twelve-ounce box of cereal at $0.30 per ounce or a twenty-ounce box at $0.23 per ounce acts reasonably in paying more per ounce." *Id*.

184. By making this reckless choice, Defendants caused a deterioration in Class Members' investment returns that compounded (and continues to compound) over time. "[J]ust as compounding can dramatically increase the value of a mutual fund investment over time, so the costs of that investment can dramatically eat into that investment over time. . . . In one year, a one percent management fee would reduce a 5% increase in a fund to 4%, and it would increase a 5% loss in a fund to 6%." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1163 (6th Cir. 2022).

185. These breaches of prudence are worsened because Defendants also acted disloyally, choosing higher prices shares to channel kickback fees to the Plans' recordkeeper, Empower.

186. While the more expensive retail Class A shares provided no benefit to plan participants, they allowed the Plans' recordkeeper, Empower, to reap the benefit of kickback fees from the mutual funds. The practice of these mutual funds (Putnam, Western, and Clearbridge) is

to pay such fees to the entity (here, Empower) credited with getting the Plan to invest in retail class shares of the funds.

187. According to the funds' SEC prospectuses at www.sec.gov/edgar, several of these retail class funds pay revenue-sharing fees, or 12b-1 fees, to Empower, the Plan's recordkeeper. In this arrangement, "mutual funds may share a portion of their revenues with retirement plan recordkeepers[.]" *Revenue Sharing - Dealing With This Hidden Cost of 401(k) Plan Administration*, 11/12/2001 RIA-PBW, at 6.

188. Perhaps the most common revenue-sharing fee is the 12b-1 fee. "A 12b-1 fee, named after a section of the Investment Company Act of 1940, is an annual marketing or distribution fee that mutual funds charge. This fee is part of the expense ratio and can range from 0.25% to 1% of the fund's net assets. . . . 12b-1 fees have come under fire over the years. After all, marketing the fund to new investors does little to enhance a fund's performance, and with total mutual fund assets in the U.S. topping $20 trillion, funds don't need to attract investors nearly as much as when Rule 12b-1 was passed." https://www.investopedia.com/terms/1/12b-1fees.asp (last visited Mar. 1, 2026). These days, "the bulk of the [12b-1 fee] money goes to commissions for brokers who sell shares in the fund to other investors." *Id*.

189. These revenue-sharing payments constituted indirect compensation to Empower (and possibly other intermediaries) on top of Empower's direct recordkeeping and administrative fees. Between the direct and indirect fees, Empower collected "recordkeeping" fees that far exceed the reasonable value for such services.

190. Indeed, recordkeeping for ERISA plans has become a highly automated, digitized, and commodified industry. Due to the automated computer systems used for recordkeeping,

recordkeepers primarily distinguish themselves on the basis of price rather than any special or unique benefits to plan participants.

191. "Scholars have investigated fees in various investment contexts and have yet to consistently identify any benefit derived from higher service fees. Instead, the literature shows that higher fees correspond to decreased earnings and diminished savings . . . . Plan participants thus do not 'get what they pay for' in any meaningful sense when it comes to paying higher fees. . . . Just as increased fees do not correlate to enhanced or improved services, they also do not correspond to value creation for 401(k) plan participants or reflect more work by the recordkeeper (again, with digital recordkeeping technology, services are automated)." Valastro, *Misapplying Twombly*, at 434–36.

192. Other research shows that funds with high fees on average perform worse than less expensive funds, even on a pre-fee-basis. Ayres & Curtis, *Beyond Diversification*, 124 Yale L.J. 1476, at 1488; Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 883 (2008).

193. Studies thus confirm that "the most consistent predictor of a fund's return to investors is the fund's expense ratio." Jill E. Fisch, Rethinking the Regulation of Securities Intermediaries, 158 U. PA. L. REV. 1961, 1993 (2010).

194. Due to the "Class A" retail shares of mutual funds selected, the Plans' recordkeeper, Empower, received much more than a reasonable amount of compensation per participant.

195. While Empower got to collect kickback fees it would not have received from less expensive share classes, participants suffered diminished earnings from these added fees. "Like all fees, the 12b-1 fee can have a significant impact on investment returns. A 12b-1 fee of just 0.75%

can cost an investor $35,000 in lost returns on a $100,000 investment that returns 5% annually over 20 years." https://www.investopedia.com/terms/1/12b-1fees.asp.

196. In sum, Defendants breached their duties of prudence by pushing participants into more expensive Class A shares when less expensive shares classes were available. And because this decision resulted in unreasonable fees being kicked back to Empower, Prisma Health violated its duty of loyalty. Each specific example of this common failure is detailed below.

### 1. Defendants chose more expensive Class A shares of Putnam

197. During the Class Period, Plaintiffs Mullins, McCluney, Mole, Gilstrap, Wells, Alexander, Ramos and Becerra purchased Class A shares of the Putnam Large Cap Value Fund, one of the largest investments, as measured by assets, in the 401(a) Plan. Due to Defendants' poor decision-making process, only Class A shares were available to Plaintiffs and other Class Members.

198. The extra costs of the more expensive share class cause (1) increased volatility of the decreased net asset values (NAVs) due to the additional revenue-sharing costs A share class participants must bear, (2) decreased returns for A class participants, and (3) consistently lower yields, as shown in the table below.

| ***Harm to Plaintiff and participants from use of Putnam Class A shares*** | |
|---|---|
| *Name* | *Average Yield 12-Month (2020 to 2025)* |
| *Putnam Large Cap Value A* | 1.30 |
| *Putnam Large Cap Value R6* | 1.61 |

199. The yields in the table above are paid monthly (1/12th each month), allowing them to compound over time. Defendants may argue they reimbursed participants' accounts for some of the revenue-sharing credits they deducted from the A share class's earnings. However, the math in the table below shows that the revenue-sharing credits deducted from participants in the A class

(even if all the money was given back) are overshadowed by the compounded growth Prisma Health Plans' participants could have achieved in the R6 class.

| ***Demonstration of the impact of lost compounding for Putnam A class*** | | | |
|---|---|---|---|
| *Prospectus Data as of 12/31/25* | Expense Ratio | 5-yr, per yr | 10-yr, per yr |
| *Putnam Large Cap Value A* | 0.88 | 20.53 | 24.43 |
| *Putnam Large Cap Value R6* | 0.54 | 21.23 | 25.67 |
| ***Difference*** | ***0.34*** | ***(0.71)*** | ***(1.24)*** |

200. The expense ratio for Putnam's A class is 0.34% higher (column 2) than that of the cheaper, identically managed R6. Even if Defendants claim they eventually gave the participants some of the revenue-sharing derived from the expense ratio difference (0.34%), the lost opportunity cost over five years is twice that credit, at 0.71% per year. Due to compounding, it rises each year and equals 1.24% per year over ten years.

201. Put simply, when participants are pushed into higher share classes, their resulting lost earnings exceed any partial rebate of revenue-sharing fees they may receive later. "[I]n the case of revenue sharing," "[t]he higher the fees, the less money available to compound and grow in each participant's investment portfolio," so it is "difficult to justify the use of revenue-sharing . . . where equivalent zero-revenue options are available." https://www.pnc.com/en/corporate-and-institutional/campaigns/understanding-investment-vehicles-and-fees.html.

202. Page 3 of the February 28, 2025 prospectus depicts the dollar costs by share class to an investor placing $10,000 into the Putnam Large Cap Value.

***Figure 1: The prospectus demonstrates the costs for the Putnam classes, namely a "Class A" cost of $660 for one year, while the "Class R6" costs $55***

| Share class | 1 year | 3 years | 5 years | 10 years |
|---|---|---|---|---|
| Class A | $660 | $840 | $1,035 | $1,597 |
| Class C | $266 | $514 | $887 | $1,732 |
| Class C (no redemption) | $166 | $514 | $887 | $1,732 |
| Class R | $115 | $359 | $622 | $1,375 |
| Class R5 | $65 | $205 | $357 | $798 |
| Class R6 | $55 | $173 | $302 | $677 |
| Class Y | $64 | $202 | $351 | $786 |

203. The difference in fees between the Putnam A and the cheaper R6 was 0.35% per year from 2020 to 2025. Participants' invested dollars over that period averaged $146,034,299. Thus, the wasted fees totaled $511,120.05 per year. Stated differently, but for Defendants' actions, participants could have had the same managers (Jaroch/DeMore), the same stocks (107), the same price-earnings ratio (20.77), and the same market cap (164485.9), and saved over $500,000 extra in their accounts each year. Defendants' lack of prudence and loyalty prevented that from happening.

204. The A class and R6 Class have the same portfolio managers (Jaroch/DeMore as of 12/31/2025), the same number of holdings (107 as of 12/31/2025), and the same management company identifier (0C00004IH9), among many other elements. As the U.S. Securities and Exchange Commission (SEC) reminds us below, the only difference is the cost paid by participants (0.88% for A and 0.54% for R6). Small differences in costs can dramatically affect participants' investment growth. Using the average account balance in both plans over plan years 2020 to 2024, an investor in the A class would pay $1,008.40 more than in the cheaper, identically managed R6 class.

| ***Demonstration of identical nature of fund's classes*** | | | | | | |
|---|---|---|---|---|---|---|
| *Name* | *Management Co. ID* | *Manager Name* | *Manager Start Date* | *No. of Holdings* | *Average Price/ Earnings Ratio* | *Average Market Cap($millions)* |
| *Putnam Large Cap Value A* | 0C00004IH9 | Jaroch, DeMore | 8/29/2012 | 107 | 20.77 | 164485.9 |
| *Putnam Large Cap Value R6* | 0C00004IH9 | Jaroch, DeMore | 8/29/2012 | 107 | 20.77 | 164485.9 |

205. The A class earned a total of 2.36% less than the cheaper, identically managed R6 share class from plan year 2020 to 2025. Going as far back as the inception year of the cheaper, identically managed R6 (2013), Plaintiff noted that from 2013 to 2020, the A share class trailed each year by an average of forty four basis points for a total lag of 3.54% over the period.

206. Because participants' wages, totaling $136,118,109, were invested at the start of 2022, participants' accounts would have been $6,639,510 larger had Defendants acted prudently by switching the A Class shares to R6 shares.

207. By selecting the Putnam Class A shares over the Class R6 shares, Defendants violated their duty of prudence, "offer[ing] plan participants higher-cost retail-class investment options . . . when otherwise identical lower-cost institution-class products were available." Valastro, *Misapplying Twombly*, at 458–59.

208. These higher-cost Class A shares also paid excessive and unjustified revenue-sharing fees to the Plans' recordkeeper, Empower. Defendants authorized the use of this money taken from participants (by choosing the more costly share class) to pay reduced share prices (NACs) resulting from these revenue-sharing fees and sent to Empower's broker-dealer. The exact

compensation for Putnam and all other mutual funds is detailed in a mutual fund selling agreement that Defendants did not provide upon request.

209. Page 6 of the February 28, 2025 Putnam prospectus states: "Financial intermediary compensation. If you purchase the fund through a broker/dealer or other financial intermediary (such as a bank or financial professional), the fund and its related companies may pay that intermediary for the sale of fund shares and related services. Please bear in mind that these payments may create a conflict of interest by influencing the broker/dealer or other intermediary to recommend the fund over another investment.

210. By selecting these more expensive shares in order to channel revenue-sharing fees to Empower, Defendants violated their duty of loyalty to plan participants. These transactions were prohibited transactions with a party-in-interest (Empower). *See* 29 U.S.C. § 1106(a)(1).

**2. Defendants selected more expensive shares of Western Fund**

211. Because all Plan investments were managed by a single Committee guided by a single investment policy, the flawed decision-making surrounding the Putnam Fund was also reflected in the Committee's selection and retention of the Western Asset Core Plus Bond.

212. Defendants selected the higher-cost Class A shares of this fund during the years 2022-2023.

213. During Prisma Health's Committee meeting in plan year 2021, when they chose to replace the cheaper, identically managed "IS" class with the "A" class, they could have easily used the FINRA FundAnalyzer or similar tools to ensure their decision-making was sound and reasonable, adding value to participants' accounts.

214. Because they replaced the cheaper, identically managed class, their investigation and decision-making were reckless and imprudent.

215. To illustrate the Western Fund's specific harm using participants' 403(b) Plan account balances, Plaintiffs used an average participant account balance of $55,511 from Prisma Health's recent governmental reporting.

216. Changing the FINRA default balance in the Western fund A versus IS, the FINRA FundAnalyzer produced the following image (showing a ~$50K balance at 5% growth over 6 years), showing the Western Fund's A class cost $3,092.48 versus $1,603.88 for the IS class.

***Figure 2: The Western Fund's Class A shares' future value and total cost were worse than the Class IS shares***




217. By selecting the Western Class A shares over the Class IS shares, Defendants violated their duty of prudence.

218. These higher-cost Class A shares paid revenue-sharing fees to the Plan's recordkeeper, Empower. By selecting these more expensive shares in order to channel revenue-sharing fees to Empower, Defendants violated their duty of loyalty to plan participants. These transactions were prohibited transactions with a party-in-interest (Empower), in violation of 29 U.S.C. § 1106(a)(1).

219. These higher-cost Class A shares also paid excessive and unjustified revenue-sharing fees to the Plans' recordkeeper, Empower. Defendants authorized the use of this money taken from participants (by choosing the more costly share class) to pay reduced share prices (NAVs) resulting from these revenue-sharing fees and sent to Empower's broker-dealer. The exact compensation for Western and all other mutual funds is detailed in a mutual fund selling agreement that Defendants did not provide upon request.

220. By selecting these more expensive shares in order to channel revenue-sharing fees to Empower, Defendants violated their duty of loyalty to plan participants. These transactions were prohibited transactions with a party-in-interest (Empower), in violation of 29 U.S.C. § 1106(a)(1).

**3. Defendants selected more expensive shares of Clearbridge Fund**

221. Similarly, in 2022, Defendants replaced Class IS shares of the Clearbridge Fund with more expensive Class A shares of the same fund.

222. All investors are urged to read a mutual fund's SEC prospectus at www.sec.gov/edgar before investing. This is a standard practice of any reasonable fiduciary. The SEC-prospectus image shows why the A share class should never have been selected if plan fiduciaries could buy the cheapest R6 (see far right column).

*Figure 3: Clearbridge Large Cap Growth Fund Prospectus April 1, 2025*

FRANKLIN TEMPLETON

ClearBridge

**ClearBridge Large Cap Growth Fund**

Class A: SBLGX Class C: SLCCX Class I: SBLYX Class IS: LSITX Class O: LCMMX Class R: LMPLX

Growth | Factsheet as of December 31, 2025

**Annual fund operating expenses (%)**

(expenses that you pay each year as a percentage of the value of your investment)

| | Class A | Class C | Class R | Class I | Class IS | Class O |
|---|---|---|---|---|---|---|
| Management fees | 0.62 | 0.62 | 0.62 | 0.62 | 0.62 | 0.62 |
| Distribution and/or service (12b-1) fees | 0.25 | 1.00 | 0.50 | None | None | None |
| Other expenses | 0.14 | 0.10 | 0.21 | 0.11 | 0.02 | 0.06 |
| Total annual fund operating expenses | 1.01 | 1.72 | 1.33 | 0.73 | 0.64 | 0.68 |

223. Defendants' selection of the Class A shares over the cheaper R6 shares was unjustifiable and reflects an imprudent and/or disloyal process.

224. By selecting the Clearbridge Class A shares over the Class R6 shares, Defendants violated their duty of prudence.

225. These higher-cost Class A shares also paid excessive and unjustified revenue-sharing fees to the Plans' recordkeeper, Empower. Defendants authorized the use of this money taken from participants (by choosing the more costly share class) to pay reduced share prices (NAVs) resulting from these revenue-sharing fees and sent to Empower's broker-dealer. The exact compensation for Clearbridge and all other mutual funds is detailed in a mutual fund selling agreement that Defendants did not provide upon request.

**F. Defendants chose funds known for underperforming their peers and scoring poorly across industry risk-and-reward metrics**

226. While Defendants' selection of poor share classes is its most glaring failure, another category of failure caused even larger damages. Plaintiffs and Class Members incurred their largest

losses when Prisma Health selected and retained mutual funds that were known to lag behind their peers with similar aims and investment styles.

227. These choices reflect an ongoing pattern of Defendants failing to adequately monitor mutual funds by applying standard metrics for acceptable risk and return, especially when compared to costs. These risk/return metrics include index benchmarks, Morningstar ratings, Sharpe Ratios, and Information Ratios ("IR").

228. Prisma Health's IPS claims that "[i]n selecting the core investment options, the Committee shall take into account reasonable criteria including . . . [p]erformance as compared to a stated benchmark and/ or an appropriate peer group(s)," "[r]isk measures versus that of the stated benchmark and/ or peer group(s)," and "[r]isk-adjusted performance versus that of the stated benchmark and/ or peer group." It further claims "the Plan's investment options will be selected" with an eye to "[c]ontrol[ling] administrative and management costs." But Defendants' actions show they ignored these considerations when selecting and retaining the Clearbridge and Western Funds.

229. Prisma Health's IPS also states that it will consider risk and return metrics including "Alpha," "Information Ratio," and "Sharpe Ratio." And under "Fund Expenses," the IPS claims Defendants will pay attention to a fund's "Expense Ratio." Despite this lip service, Defendants' actions prove they ignored each of these measures when choosing to retain the Clearbridge, Western, and John Hancock Funds.

230. "Alpha" measures how much value a manager adds beyond simply matching the market's returns. A mutual fund's alpha is currently positive if it beats its benchmark.

231. The Sharpe Ratio and IR are measures of risk relative to return, but they use different metrics. The Sharpe Ratio measures "risk-adjusted return," measuring return against an

investment considered risk-free, such as U.S. Treasuries, and measuring risk by volatility, or "standard deviation" (how much the asset's price swings up and down).

232. On the other hand, IR measures how much extra return a fund consistently generates when compared with a benchmark such as the S&P 500 index. It effectively measures a fund's alpha, or excess returns compared to the index, against the volatility of those returns. The IR is often used to gauge the skill of managers of mutual funds, hedge funds, and other actively-managed funds. In this case, it measures the expected active return of the manager's portfolio divided by the amount of risk that the manager takes relative to the benchmark.

233. The difference between the Sharpe Ratio and IR is explained in the chart below, available at https://www.investopedia.com/terms/i/informationratio.asp.

**Information Ratio vs. Sharpe Ratio**

| Feature | Sharpe Ratio | Information Ratio |
|---|---|---|
| **Focus** | Overall risk-adjusted return | Active management skill (relative to a benchmark) |
| **Risk Type** | Total risk (volatility) | Active risk (tracking error) |
| **Benchmark** | Risk-free rate (e.g., Treasury bills) | A relevant market index (e.g., S&P 500) |
| **Interpretation** | Higher = Better overall risk-adjusted return | Higher = Better active management skill |
| **Use Case** | General investment evaluation | Evaluating actively managed funds or portfolios |
| **What's Good?** | Depends, but greater than one is generally considered good | Depends, but greater than 0.5 is often considered good, and anything over 1.0 is excellent. |

234. Before selecting an investment menu for an ERISA plan, a prudent fiduciary would know to review an asset's Sharpe Ratio and IR. In a fiduciary account, an IR below 0.5 and a Sharpe Ratio below 1.0 are generally considered insufficient to justify inclusion. These measures are used to ensure that a fund does not add uncompensated risk to a portfolio.

235. A mutual fund's IR becomes especially important if it is an actively-managed fund. Such funds command higher costs, or "expense ratios," based on their alleged propensity to beat their benchmarks. By contrast, passive index funds charge lower fees because they merely copy their benchmarks (e.g., the S&P 500). The difference in costs between active funds and index funds can be dramatic. For 401(k) plan participants in 2021, "the average expense ratio of actively managed equity mutual funds [in such plans] fell to 0.68 percent," but "[i]ndex equity mutual fund expense ratios fell . . . to 0.06 percent[.]"[22]

236. Actively-managed funds charge these higher fees in exchange for a reasonable likelihood of consistently beating their benchmarks. If an actively-managed fund has an IR below 0.5, it is effectively charging a premium price for no consistent benefit. This is classic uncompensated risk.

237. At all relevant times, a fiduciary employing a prudent process would also have been aware that Morningstar peers predominate as the comparator in monitoring and reporting.

238. Morningstar also rates assets within various Morningstar Categories on a scale of one to five stars. Each Morningstar Category seeks to group various investments into peer categories based on similar risk, return, and behavior profiles. All Morningstar star ratings are backward-looking, risk-adjusted rankings of a fund relative to other funds in its Morningstar Category. Funds are then ranked within their category on this risk-adjusted return; the top 10% get 5 stars, the next 22.5% get 4 stars, and the middle 35% get 3 stars, and so on. While Morningstar ratings have major limitations,[23] a sub-par Morningstar rating would alert a reasonable fiduciary off the need to deeply scrutinize whether a mutual fund should be replaced.

---

[22] https://www.ici.org/system/files/2022-03/per28-02_2.pdf (last visited 4/15/2026).

[23] For example, a Morningstar rating is measured against the Morningstar Category, not versus the broad market or its prospectus benchmark. Each Morningstar Category includes retail-class mutual

239. Defendants failed this basic test, employing a reckless process that led to the selection and retention of the Clearbridge and Western Funds for years, and to inexplicably add the John Hancock Fund in 2024. Each of these funds consistently trailed behind their peers and benchmark indexes. And each of these funds carried a sub-par IR, Sharpe Ratio, and negative alpha despite a high expense ratio.

240. Notably, Prisma Health's own IPS required the Committee to consider these very metrics—including IR, Sharpe Ratio, and expense ratios—as part of its monitoring process, yet the Committee failed to act on the red flags these metrics revealed.

241. By employing an imprudent process that failed to replace these funds with more suitable alternatives, Defendants hamstrung participants' returns to the tune of more than one hundred million dollars.

**1. Clearbridge**

242. Since 2020, both Plans invested in the Clearbridge Fund.

243. The Clearbridge SEC prospectus at www.sec.gov/edgar and on the corporate website shows a meaningful benchmark with similar aims, risks, rewards, and characteristics to the challenged fund, the Russell 1000 Growth TR USD (image below).

---

funds that would not be appropriate for an institutional or fiduciary plan, so a fund may receive a high rating even if it would never be prudent in a fiduciary account. Morningstar can be biased as it defines the composition of its peer group for each fund using its own proprietary rating system (e.g., Large Blend, Intermediate Core Bond). Because of limitations in its methodology, many mutual funds with high Morningstar ratings may still be poor investments compared to peers. Plaintiff is not endorsing Morningstar ratings as a conclusive measure. Still, a sub-par Morningstar rating is such a visible negative indicator that it should trigger scrutiny and a review of alternative options.

ClearBridge Investments

**Dated: 09-30-2025**

**Benchmark**: Russell 1000 Growth TR USD

244. By measuring the Clearbridge Fund against this benchmark, an IR for the fund can be calculated.

245. For a prudent ERISA fiduciary constructing an investment menu, minimum acceptable IR is 0.5, meaning investors aim to earn 50% of the risk they take. For example, investors risking a 3% loss would target a 1.5% return. Ideally, the IR is one percent gain for each one percent of risk. An IR of 1.0 indicates the return matches the risk undertaken.

246. At the start of the 2020 plan year, the following facts were present based on the Clearbridge prospectus benchmark (Russell 1000 Growth TR USD).

247. The Clearbridge Large-Cap Growth Fund (all classes) trailed its benchmark by 3.17% per year over the three-year period from 2018 to 2020. The Clearbridge Fund also trailed its Russell index by 2.77% per year from 2016 to 2020 (5-yr).

248. The Clearbridge Fund trailed its benchmark index by almost 1% per year (one hundred basis points) over the ten-year period from 2011 to 2020 (0.92% per year). Thus, the portfolio manager added no value, and participants paid 1.02% per year on their assets in this fund. The return versus risk financial factor, or IR, was negative 0.19 over the 2011 to 2020 period. The Clearbridge fund should have been removed in plan year 2020.

249. To a prudent fiduciary in 2020-2021, the Clearbridge Fund's failure to match its benchmark would have stood out when compared to the premium price it charged investors. For the Class A shares selected by Defendants, the Clearbridge Fund charged an expense ratio above

1.0%. This price far exceeded what was typical. In 2019, expense ratios for all equity mutual funds averaged 0.52 percent, and expense ratios for actively-managed funds averaged 0.74 percent.[24] By 2021, "the average expense ratio of actively managed equity mutual funds fell to 0.68 percent," while "[i]ndex equity mutual fund expense ratios fell from 0.27 percent in 1996 to 0.06 percent in 2021."[25] Thus, the Clearbridge Fund's expense ratio exceeded the average for actively-managed equity funds by about 50%, and exceeded the average for index funds by nearly 2,000%. Plaintiff and Class Members had to bear these costs.

250. Such an exorbitant price could only have been justified if the Clearbridge Fund had a reasonable likelihood of consistently beating its index after subtracting these excess costs. In 2020, 2021, 2022, 2023, and 2024, a prudent fiduciary would have understood that the Clearbridge Fund was not reasonably likely to meet this objective.

251. Prisma Health's failure to consider these facts belies its IPS, which states that it will scrutinize each investment's expense ratio, IR, and alpha.

252. By 2022, Morningstar downgraded the Clearbridge Fund to a mere three out of five stars.[26]

---

[24] https://www.ici.org/news-release/20_news_trends (last visited 4/15/2026).
[25] https://www.ici.org/system/files/2022-03/per28-02_2.pdf (last visited 4/15/2026).
[26] Based on the Wayback Machine's 2022 screenshot from Morningstar site, *available online at*: https://web.archive.org/web/20221203115202/https://www.morningstar.com/funds/xnas/sblgx/quote (last visited 4/15/2026).




253. This downgraded rating would have caused a prudent fiduciary to question its inclusion and examine other metrics in detail, as Prisma Health's IPS required.

254. The same year, the Clearbridge Fund's Sharpe Ratio fell below 1.0. It has remained below 1.0 ever since. By failing to appropriately evaluate the Clearbridge Fund's Sharpe Ratio, Prisma Health ignored its own IPS.

255. From 2020 to 2024, participants invested an average of $185,960,179 in this fund. As a result, they paid $1,896,793 per year in excess management fees that were not productive. They could have bought the Russell 1000 Growth index mutual fund for less than ten basis points (0.07% from 2020 to 2024, 0.06% in 2025; Vanguard Russell 1000 Growth).

256. Similar facts and circumstances later existed when Defendants performed the periodic evaluations of the Clearbridge fund during the plan years of 2021, 2022, 2023, and 2024. Thus, the Clearbridge fund should have been removed from the Plan in 2021, 2022, 2023, and 2024, yet it was not.

257. Given the Clearbridge portfolio manager's difficulty in matching or beating the SEC-prospectus benchmark index, common sense would require an investigation into whether to allow participants to buy an index-based fund. If Defendants had done that, for example, by using

the Vanguard Russell 1000 Growth Index I, participants' accounts would have had an additional 103,483,261 dollars.

**2. Western Asset Core Bond Fund**

258. As alleged above, Defendants first added the Western Asset Core Plus Bond Fund to the 401(a) Plan as of September 30, 2019 and retained it until 2024.

259. In the 403(b) Plan, the Western Asset Core Plus Bond IS was on the 2021 plan year filing.

260. In the first plan year of the putative class period (2020), this fund's financial factors were easily accessible to the Committee. Over the ten years from 2011 to 2020, the Western Asset Core Plus Bond trailed its benchmark index by 0.27% per year. The risk, measured by standard deviation relative to the "appropriate broad-based securities market index," 29 C.F.R. § 2550.404a-5, was 3.5% per year over the ten years. Participants would have been better off buying the index via mutual funds designed to track the Bloomberg US Aggregate Bond TR USD Index.

261. Within the Morningstar ratings, the Western Fund's peer category is the "Intermediate Core-Plus Bond Cat. Avg." If this peer category is substituted for the index, Plaintiff found that the harm increased significantly to $15,502,829, compared with using an average peer mutual fund in the Intermediate Core-Plus Bond category.

262. As of January 1, 2021, there were 624 mutual funds labeled as peers to the Western Fund by Morningstar that Defendants could have investigated. The Western Fund trailed the peer category by 0.81% per year over the ten years from 2011 to 2020. The risk (standard deviation) versus peers was 3.7% per year. These poor numbers translate into a negative IR for this fund that would have been evident to the Committee in 2021.

263. Despite its consistent failure to meet its benchmark, each class of the Western Fund charged plan participants an above average expense ratio. "[F]or bond mutual funds," the average expense ratio for 401(k) plan participants "fell from 0.32 percent in 2020 to 0.25 percent in 2021."[27] In 2020 and 2021, both the IS and A Class shares of the Western Fund exceeded these average costs. At the time it charged these prices, the Western Fund's ten-year history proved it had failed to yield any consistent benefit in the form of "alpha," or returns over benchmark.

264. No later than December 2021, Morningstar reduced the Western Fund's star rating to three out of five stars. This is based on Morningstar's peer categories, which includes retail funds that would not even be appropriate for a fiduciary account.[28]

**Western Asset Core Plus Bond I** WACPX★★★ Morningstar Analyst Rating

Analyst rating as of Dec 22, 2021

Quote Fund Analysis Performance Sustainability Risk Price Portfolio People Parent

| NAV / 1-Day Return | Total Assets | Adj. Expense Ratio | Expense Ratio | Fee Level | Longest Manager Tenure |
|---|---|---|---|---|---|
| 10.53 / ↓0.64% | 36.0 Bil | 0.450% | 0.450% | Below Average | 15.28 years |
| **Category** | **Credit Quality / Interest Rate Sensitivity** | **Min. Initial Investment** | **Status** | **TTM Yield** | **Effective Duration** |
| Intermediate Core-Plus Bond | Medium / Moderate | 1,000,000 | Open | 2.94% | 7.59 years |

USD | NAV as of Apr 08, 2022 | 1-Day Return as of Apr 08, 2022, 6:50 PM GMT+00:00

265. In late 2021, this downgraded Morningstar rating would have at least caused a prudent fiduciary to review other metrics, especially its negative IR.

266. In 2021, the Western Fund's Sharpe Ratio fell below the minimally acceptable ratio of 1.0. It has remained below 1.0 ever since. By failing to appropriately evaluate the Western Fund's Sharpe Ratio, Prisma Health ignored its own IPS.

[27] https://www.ici.org/system/files/2022-06/per28-06.pdf (last visited 4/15/2026).

[28] https://web.archive.org/web/20220411203405/https://www.morningstar.com/funds/xnas/wacpx/quote (last visited 4/15/2026).

267. If the Committee had considered this information, it would have removed the Western Fund in 2020, 2021, 2022, or 2023.

## VII. ERISA'S PROHIBITED TRANSACTIONS PROVISIONS

268. Restrictions under ERISA prohibit fiduciaries from causing the Plans to engage in transactions with themselves or other fiduciaries or parties-in-interest. *See* 29 U.S.C. § 1106(a)-(b). Section 1106(a)(1) states, in pertinent part:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> . . .
>
> (C) furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

269. Section 1106(b) further provides, in pertinent part:

> A fiduciary with respect to the plan shall not –
>
> (1) deal with the assets of the plan in his own interest or for his own account,
>
> (2) in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interests of its participants or beneficiaries, or
>
> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

270. During the Class Period, Defendants allowed Plan assets to be invested in the Prisma Stable Value Fund that performed poorly when compared to other investments that were

available, and knowing that Prudential/Empower, or its affiliates, were/are offering recordkeeping and trustee services to the Plans.

271. Prudential/Empower was a party in interest[29] to the Plans as it was receiving compensation for managing/maintaining the Prisma Stable Value Fund, as well as indirect compensation from the spread – the difference between the amount Prudential/Empower earned on the investments and the amount Prudential/Empower paid to Plan participants.

272. As an alternative to investing Plan assets in the Prisma Stable Value Fund, the Plans could have invested assets in better performing investments with the same investment strategies and goals. Defendants failed to consider this approach because it would have eliminated the compensation earned by Prudential/Empower.

273. Defendants did not prudently and objectively evaluate the Prisma Stable Value Fund in the interests of Plan participants, as prudent fiduciaries would do. Rather, Defendants selected the Prisma Stable Value Fund in order to benefit Prudential/Empower and its affiliates.

274. The Plans' sizeable investments in the Prisma Stable Value Fund provided Prudential/Empower a substantial amount of compensation at the expense of Plan participants.

275. In addition, Defendants engaged in prohibited transactions to provide revenue-sharing fees to the Plans' affiliates. According to its 5500 filings, "[f]ees incurred by the Plan for the investment management services" provided by Empower "are paid through revenue sharing, rather than a direct payment."

---

[29] "Certain Plan investments are managed by [Empower] and VALIC, the custodians as defined by the Plan and, therefore, these transactions qualify as party in interest transactions." Auditor's Report, attached to 2024 Form 5500 for the 403(b) Plan, at 12 and Auditor's Report, attached to 2024 Form 5500 for the 401(a) Plan, at 13.

276. These revenue-sharing kickbacks provided Empower a motive to select higher-cost shares of the Clearbridge, Putnam, and Western Funds, as well as the Prisma Stable Value Fund. These selections resulted in Empower receiving compensation as a result of the Plans' investments in these assets. These fees also provided a motive for Defendants to retain the underperforming funds rather than switching to better alternatives.

277. The inclusion of these higher fee options was unnecessary because, among other things, it violated Defendants' duty of impartiality. Under ERISA, "fiduciaries owe a duty to treat all participants and beneficiaries impartially." *Su v. RiversEdge Advanced Ret. Sols., LLC*, No. 2:24-cv-00104, 2024 WL 1193858, at *9 (W.D. Pa. Feb. 20, 2024) (internal citations omitted).

278. Because the Plans provided other mutual fund options that did not pass on revenue-sharing fees to Empower, more sophisticated investors could select those options. Thus, "investors who choose . . . high-cost funds effectively subsidize the administrative expenses of plan participants who opt into the low-cost options. . . . Why should unsophisticated investors fund the retirement accounts of workers with the sophistication to opt out of low-quality choices?" Ayres & Curtis, *Beyond Diversification*, 124 Yale L.J. at 1513. Due to these transactions, Participants who invested in funds with revenue-sharing were forced to subsidize the costs of Empower's services for the Plans as a whole.

279. There was no need for Defendants to violate their duty of impartiality or to engage in interested-party transactions to pay for investment services. In each of these years, all fees paid to Empower through revenue-sharing could have been covered by forfeited nonvested assets, known as forfeitures.

280. Forfeitures occur because participants' interests in employer contributions are not immediately vested. Vesting occurs over years based on a vesting schedule. If an employee leaves

the company prior to vesting, the nonvested portion of a participant's account becomes an asset of the plan, called a forfeiture. The plan documents may dictate how forfeitures should be applied or may give discretion to the plan fiduciary.

281. Here, the Plans gave the Committee discretion as to how to use forfeitures. For instance, the 401(a) Plan's SPD, effective August 26, 2022, states, "[f]orfeitures may be used to pay plan expenses or used to reduce any nonelective contribution." Because the Committee had a choice of how to apply the forfeitures, its decision was a fiduciary choice. In 2024 and 2023, the 401(a) Plan's forfeited nonvested accounts totaled $1,354,139 and $8,831,824, respectively. In 2024, the Committee and Prisma chose to apply $7,834,787 of the forfeitures to reduce their contributions. They did not apply these funds to pay Participants' administrative expenses. This decision benefited them but did not benefit Plan participants.

282. A reasonable fiduciary, considering the Participants interests, would have considered using these forfeitures to cover any administrative expenses that were paid for by revenue-sharing fees. This would have avoided the breach of Defendants' duty of impartiality and the self-interest that pushed Defendants to retain underperforming funds. By choosing not to use forfeitures to avoid the interested party transactions, Defendants breach their duty of loyalty.

## COUNT I
## Breaches of Fiduciary Duty of Prudence
## (Prisma Stable Value Fund)
## (against the Retirement Committee and Administrative Committee Defendants)

283. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

284. At all relevant times, the Retirement Committee and the Administrative Committee, and their members ("Prudence Defendants") were fiduciaries of the Plans within the meaning of

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

285. As fiduciaries of the Plans, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plans for the sole and exclusive benefit of Plans' participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

286. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Prisma Stable Value Fund based solely on the merits of the investment and what was in the best interest of Plans' participants. Instead, the Prudence Defendants selected and retained the Prisma Stable Value Fund in the Plans despite poor performance in relation to other comparable investments.

287. As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Prisma Stable Value Fund, the Plans suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

288. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plans all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

289. The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**BREACH OF DUTY OF PRUDENCE**
**(HIGHER Cost Share Class Selection)**
**29 U.S.C. § 1104(A)(1)(A)**

290. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

291. Prudence Defendants breached their duty of prudence by:

a. Offering higher-cost retail share classes instead of available lower-cost institutional share classes.

b. Failing to monitor and remove these higher-cost shares and replace them with lower-cost institutional shares.

c. Failing to engage in a prudent and documented process for evaluating Plan fees and investments, as further described in the class certification allegations; and

d. Failing to negotiate with service providers to reduce Plan costs.

292. This common pattern of behavior led to Prudence Defendants' selection and retention of higher-cost Class A shares of the Clearbridge, Western, and Putnam Funds described throughout this Complaint. In each instance, Prudence Defendants chose more expensive share classes over less expensive shares, without providing any additional benefit to plan participants.

293. Based on Forms 5500 filed from 2009 to the present, the Plans' investment lineup and fee structure reflect systemic process failures rather than isolated or reasonable fiduciary decisions.

294. Under ERISA §§ 409(a), 502(a)(2), and (a)(3) (29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3)), Defendants are liable to restore to the 401(a) Plan all losses caused by its breaches, disgorge any profits derived from Plan assets, and provide other appropriate relief.

295. On behalf of the Plans, Plaintiffs also seek appropriate equitable relief under ERISA § 502(a)(3), recovery of prejudgment interest, and an award of attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).

**COUNT III**
**BREACH OF DUTY OF PRUDENCE**
**(Imprudent PROCESS for Selecting and Retaining Investments)**
**29 U.S.C. § 1104(A)(1)(A)**

296. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

297. Prudence Defendants breached their duty of prudence by failing to evaluate returns and risks against meaningful benchmarks and peers with similar aims and characteristics.

298. This inadequate fiduciary process led Prudence Defendants to select and retain mutual funds with abysmal risk/return profiles under basic metrics, including poor IRs, Sharpe Ratios, and Morningstar ratings.

299. This common breach of duty infected Defendants' selection and retention of the Clearbridge, Western, and the John Hancock Bond Funds, which trailed their peers and their respective benchmarks at all relevant times, and each carried sub-par Morningstar ratings.

300. Based on Forms 5500 filed from 2009 to the present, the Plans' investment lineup and fee structure reflect systemic process failures rather than isolated or reasonable fiduciary decisions.

301. Under ERISA §§ 409(a), 502(a)(2), and (a)(3) (29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3)), Prudence Defendants are liable to restore to the 401(a) Plan all losses caused by its breaches, disgorge any profits derived from Plan assets, and provide other appropriate relief.

302. On behalf of the Plans, Plaintiffs also seek appropriate equitable relief under ERISA § 502(a)(3), recovery of prejudgment interest, and an award of attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g).

**COUNT IV**
**Failure to Adequately Monitor Other Fiduciaries**
**(against the Company)**

303. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

304. Prisma Health (the "Monitoring Defendant") had the authority to appoint and remove members of the Retirement Committee and Administrative Committee, and the duty to monitor the Retirement Committee and Administrative Committee and was aware that the Retirement Committee and Administrative Committee had critical responsibilities as fiduciaries of the Plans.

305. In light of this authority, the Monitoring Defendant had a duty to monitor the Retirement Committee and Administrative Committee to ensure that the Retirement Committee and Administrative Committee were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plans in the event that the Retirement Committee and Administrative Committee were not fulfilling those duties.

306. The Monitoring Defendant also had a duty to ensure that the members of the Retirement Committee and Administrative Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained

adequate records of the information on which they based their decisions and analysis with respect to the Plans' investments; and reported regularly to the Company.

307. The Monitoring Defendant breached its fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Retirement Committee and Administrative Committee or have a system in place for doing so, standing idly by as the Plans suffered significant losses as a result of the Retirement Committee and Administrative Committee's imprudent actions and omissions.

308. As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars in losses. Had the Monitoring Defendant complied with its fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

309. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plans all losses caused by its failure to adequately monitor the Retirement Committee and Administrative Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**COUNT V**
**PROHIBITED TRANSACTION**
**(against all Defendants)**

310. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

311. As the Plans' recordkeeper, Empower is a party-in-interest to the Plans within the meaning of ERISA, and Prisma Health was a fiduciary during the Class Period.

312. Defendants allowed the 401(a) Plan to select a series of Class A mutual fund options that resulted in Empower being paid excessive indirect compensation, which must be restored to the 401(a) Plan.

313. As described above, Empower received excessive compensation through revenue-sharing arrangements with the Putnam, Clearbridge, and Western Funds. These revenue sharing fees included, at a minimum, excessive 12b-1 fees, and may have included other fees (*e.g*., sub-transfer-agent fees).

314. Empower's excessive compensation resulted from Defendants' prohibited transactions, selecting Class A mutual fund shares that paid kickback fees to Empower without providing any corresponding benefit to plan participants.

315. These interested-party transactions also violated Defendants' duty of impartiality. Because the Plans' other investment options carried lower fees and did not pass revenue-sharing fees to Defendants, Participants investing in the challenged funds effectively subsidized Plan expenses for those who invested in better funds.

316. This impartiality problem could have been avoided had Prisma considered whether to pay for Plan services not through revenue-sharing but through forfeitures. During the Class Period, sufficient forfeitures existed to cover these amounts. By choosing to apply the forfeitures to reduce Prisma's contributions while paying Empower, in part, through interested-party transactions, Defendants breached their duty of loyalty twice over.

317. In violation of ERISA § 406(a) and outside the protections of ERISA § 408(b)(2), Prisma Health caused the Plans to engage in transactions involving service providers and investments that were not necessary for the operation of the Plans and that involved compensation exceeding reasonable amounts.

318. Defendants knowingly caused the Plans to incur excessive revenue-sharing costs that bore no reasonable relationship to the value of services provided, constituting prohibited transactions under 29 U.S.C. § 1106(a)(1).

319. Prisma Health knew or should have known that Empower and other service providers would receive excessive direct or indirect compensation from Plan assets, resulting in impermissible transfers of Plan assets to parties-in-interest.

320. As a direct and proximate result of these prohibited transactions, the Plans paid millions of dollars in excessive administrative and investment-related fees and suffered millions of dollars in losses.

321. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Prisma Health is liable to restore all losses suffered by the Plans and to disgorge all revenues received as a result of the prohibited transactions. Plaintiff also seeks appropriate equitable relief under 29 U.S.C. § 1132(a)(3).

322. Plaintiffs therefore seek all remedies available to them and to the Plans to redress these prohibited transactions.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F. Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of Plans' fiduciaries deemed to have breached their fiduciary duties;

I. An award of pre-judgment interest;

J. An award of costs pursuant to 29 U.S.C. § 1132(g);

K. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L. Such other and further relief as the Court deems equitable and just.

Dated: July 10, 2026

Respectfully submitted,

*/s/ Nekedia Heath*
Nekedia Heath, Esquire
S.C. Bar #13991
**HEATH LAW, LLC**
311 Pettigru Street
Greenville, SC 29601
Email: nekedia@heathlaw.org
Tel.: (864) 214-3132

Mark K. Gyandoh, Esquire
(Admitted *Pro Hac Vice*)
James A. Maro, Esquire
(Admitted *Pro Hac Vice*)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
jamesm@capozziadler.com
Tel.: (610) 890-0200

James R. DeMay*
**BRYSON HARRIS SUCIU & DEMAY, PLLC**
900 West Morgan Street
Raleigh, NC 27603
Email: jdemay@brysonpllc.com
Tel: (704) 941-4648

Jimmy W. Mintz*
**BRYSON HARRIS SUCIU & DEMAY, PLLC**
201 Sevilla Avenue, 2nd Floor
Coral Gables, FL 33134
Email: jmintz@brysonpllc.com
Tel.: (786) 879-8200

Lee Melchionni*
**LRJ LAW GROUP, LLP**
1100 H Street NW, Ste. 840
Washington, D.C. 20005
Email: lee@lrj401k.com

*Counsel for Plaintiffs and the Putative Class*

**Pro Hac Vice Applications Forthcoming*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2026, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By: */s/Mark K. Gyandoh*
Mark K. Gyandoh, Esq.